(No. 71687.—

THE DEPARTMENT OF PUBLIC AID *ex rel.* MONICA COX, a Minor, by Krystal Blair, Appellant, v. WILLIAM MILLER, JR., Appellee.

*Opinion filed January 30, 1992.*

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Tanya Solov, Assistant Attorney General, of Chicago, of counsel), for appellant.

Gary L. Morris, of Peoria, for appellee.

JUSTICE CUNNINGHAM delivered the opinion of the court:

The Illinois Department of Public Aid (Department) brought a paternity action in the circuit court of Tazewell County on behalf of Monica Cox (petitioner), a minor. The Department sought a determination that William Miller, Jr. (respondent), is the father of Monica Cox, requested reimbursement for public aid already provided to Monica and her mother, and asked for future support for the child.

Miller filed a motion to dismiss based on a 1978 settlement agreement between him and the child's mother, wherein he agreed to pay the mother $5,000 and she agreed to dismiss the paternity action she had filed at that time. The circuit court denied Miller's motion and authorized an interlocutory appeal pursuant to Supreme Court Rule 308 (134 Ill. 2d R. 308). The appellate court granted leave to appeal and reversed and remanded the cause. (211 Ill. App. 3d 1111 (unpublished order under Supreme Court Rule 23).) We granted appellant's petition for leave to appeal under Rule 317 (134 Ill. 2d R. 317), which provides for appeal as of right when a constitutional question is raised.

The settlement order in issue stated:

"[T]he parties by and through their attorneys representing unto the Court that the cause has been settled under the following terms:

1. Payment to Krystal Cox of a lump sum of $5,000 within 20 days after the entry of this order by Defendant.

2. Execution of a Consent to adopt by the Defendant.

3. The understanding that the Defendant does not admit paternity but is buying his peace from the suit."

The order went on to state that the cause was being dismissed with prejudice, and was signed by a circuit judge of Tazewell County on July 8, 1978.

In denying the motion to dismiss filed by respondent, the circuit court found that the settlement order was insufficient under the Paternity Act (Ill. Rev. Stat. 1983, ch. 40, par. 1351 *et seq.*) because it failed to make statutorily mandated findings regarding the best interests and financial security of the child. The court noted that a guardian had not been appointed for the minor at the time of the settlement order, which also made it insufficient.

In response to the interlocutory appeal, the appellate court reversed the circuit court's order and remanded the cause solely for the purpose of adjudicating whether respondent was Monica's father. In *Department of Public Aid ex rel. Spurgetis v. Newburg* (1989), 181 Ill. App. 3d 424, the appellate court concluded that the Illinois Parentage Act (Ill. Rev. Stat. 1989, ch. 40, par. 1451 *et seq.*), which parallels the Paternity Act, "continues to preserve the finality afforded to court-approved settlement orders and does not permit the mother, alleged father, or a public agency which has supported the child to bring an action after a court-approved settlement has been reached." (*Newburg*, 181 Ill. App. 3d at 427.) Relying on its decision in *Newburg*, the appellate court held that if the settlement was in conformance with the Paternity Act, all claims other than an action by Monica to ascertain paternity were barred.

Addressing the trial court's attack on the lack of explicit findings in the circuit judge's order, the appellate court looked to that section of the Paternity Act regarding settlement orders:

"In cases where the putative father has not acknowledged paternity and where the parties have requested a settlement, the court shall review the proposed settlement in the light of the allegations made, the probable evidence and the circumstances of the parties. If the court is satisfied the best interests of the child and of the parties will be served by entry of an order incorporating the settlement, and if it is satisfied that the financial security of the child is adequately provided for and that the child and its mother are not likely to become public charges, it may enter an order to that effect. The order may be directed to the defendant, or the mother, or both." Ill. Rev. Stat. 1983, ch. 40, par. 1360.

The appellate court determined that absent a showing that the circuit judge had failed to consider the factors set forth in the Act, no error would be presumed. The court

also concluded that had the circuit judge not been "satisfied" with the settlement, he would not have signed the order.

Referencing the trial court finding that the minor was not represented by a guardian *ad litem*, the appellate court pointed out that "nowhere in the Paternity Act was it required that a guardian *ad litem* be appointed to protect the minor's interest. The identity of the interests of the mother are sufficient under the statute," per the appellate court order.

Finally, the appellate court noted that because the 1978 case was brought by the Department of Public Aid on behalf of the mother, Krystal Blair, it was "inappropriate" for the Department to now attempt to avoid an order settling the earlier case. The Department denies that it was a party to the previous action, but rather asserts that the caption was misleading because "[a] bastardy proceeding is brought in the name of the People of the State of Illinois." The record indicates that Krystal Blair was represented by a private attorney.

The issue we decide is whether a settlement order and dismissal entered in a paternity action bar a subsequent action brought by or on behalf of the illegitimate minor for support. We hold that it does not.

Petitioner argues that a nonmarital child's right to equal protection entitles the child to pursue support from the putative father notwithstanding a settlement agreement entered into by the mother and father. Respondent argues that equal protection does not entitle the child to pursue child support from the putative father after there has been a settlement agreement entered into by the mother and putative father. Respondent further argues that for purposes of finality, the State has an interest in promoting out-of-court settlements, as evidenced by the settlement provisions of the Paternity Act of 1957 set forth above.

The Paternity Act was repealed in response to the United States Supreme Court's denunciation of State statutes which denied equal protection to nonmarital children seeking support from their parents. (*Klawitter v. Crawford* (1989), 185 Ill. App. 3d 778, 781-82.) The Illinois Parentage Act was enacted in its place, and contains a similar settlement provision:

"§12.1. Settlement Orders. In cases where the alleged father has not consented to a finding of paternity and where the parties have requested a settlement, the court shall review the proposed settlement in light of the allegations made, the probable evidence and the circumstances of the parties. If the court is satisfied that the best interests of the child and of the parties will be served by entry of an order incorporating the settlement, and if the court is satisfied that the financial security of the child is adequately provided for and that the child and its mother are not likely to become public charges, it may enter an order so incorporating the settlement. The order may be directed to the defendant, or the mother, or both. Notwithstanding subsection (d) of Section 7 of this Act, neither the entry of a settlement order, nor the terms of a settlement order shall bar an action brought under this Act by a child to ascertain paternity." Ill. Rev. Stat. 1989, ch. 40, par. 2512.1.

The Illinois Marriage and Dissolution of Marriage Act also promotes settlement, as evidenced by the following provisions:

"§502. Agreement. (a) To promote amicable settlement of disputes between parties to a marriage attendant upon the dissolution of their marriage, the parties may enter into a written or oral agreement containing provisions for disposition of any property owned by either of them, maintenance of either of them and support, custody and visitation of their children.

\* \* \*

(f) *Except for terms concerning the support, custody or visitation of children,* the judgment may expressly preclude or limit modification of terms set forth in the judgment if

the agreement so provides. Otherwise, terms of an agreement set forth in the judgment are automatically modified by modification of the judgment." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 40, pars. 502(a), (f).

As the above language indicates, however, the Illinois Marriage and Dissolution of Marriage Act expressly prohibits parties to an agreement from limiting or precluding the modification of child support. Furthermore, this court has held that in dissolution of marriage proceedings, a court is not bound by the agreement between the parties providing for the support of children. (*Blisset v. Blisset* (1988), 123 Ill. 2d 161, 167.) Accordingly, even where a settlement exists between the parents, no marital child is barred from seeking additional support.

The Supreme Court has held that "a State may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally *** [and] once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother." *Gomez v. Perez* (1973), 409 U.S. 535, 538, 35 L. Ed. 2d 56, 60, 93 S. Ct. 872, 875; *Mills v. Habluetzel* (1982), 456 U.S. 91, 92, 71 L. Ed. 2d 770, 773, 102 S. Ct. 1549, 1551.

In *Gomez*, the Court struck down as violative of equal protection a Texas statute which allowed legitimate children a judicially enforceable right to support from their natural fathers while at the same time denying that right to illegitimate children. (*Gomez v. Perez* (1973), 409 U.S. 535, 35 L. Ed. 2d 56, 93 S. Ct. 872.) In *Mills*, the Court struck down another Texas statute barring paternity suits brought on behalf of illegitimate children more than one year after their birth, also as a violation of equal protection. (*Mills v. Habluetzel* (1982), 456 U.S. 91, 71 L. Ed. 2d 770, 102 S. Ct. 1549.) While acknowledging that the State

would have more of an interest in preventing the prosecution of stale or fraudulent claims in support suits by illegitimate children than in support suits by legitimate children, the *Mills* Court indicated that such restrictions can survive equal protection scrutiny only to the extent that they are substantially related to a legitimate State interest. *Mills*, 456 U.S. at 99, 71 L. Ed. 2d at 777-78, 102 S. Ct. at 1554-55.

The statute in question in *Mills* allowed illegitimates only one year to sue their natural father for support while allowing legitimates until the age of 18 to seek such support.

In a concurring opinion, Justice O'Connor stated:

"To begin with, the strength of the asserted state interest [preventing stale and fraudulent claims] is undercut by the countervailing state interest in ensuring that genuine claims for child support are satisfied. The State's interest stems not only from a desire to see that 'justice is done,' but also from a desire to reduce the number of individuals forced to enter the welfare rolls. *** Thus, while the State surely has an interest in preventing the prosecution of stale and fraudulent claims, at the same time it has a strong interest, peculiar to the State itself, in ensuring that genuine claims for child support are not denied." *Mills*, 456 U.S. at 103-04, 71 L. Ed. 2d at 780-81, 102 S. Ct. at 1557.

We find the language of Justice O'Connor to be instructive in this case. Here, too, there are countervailing State interests—the interest in encouraging finality through out-of-court settlements versus the interest in ensuring that those who parent children provide support for those children, rather than the State's supporting those children through its welfare system.

Justice O'Connor also pointed out that recent scientific developments in blood testing have dramatically reduced the possibility that a defendant will be falsely accused of being the illegitimate child's father. (*Mills*, 456 U.S. at 104 n.2, 71 L. Ed. 2d at 781 n.2, 102 S. Ct. at 1557 n.2.) Prior

to these scientific developments, it was often very difficult to prove paternity, making the settlement provisions of the Paternity Act much more attractive to mothers and alleged fathers. Rather than risk losing any claim for support because paternity could not be proven, mothers were willing to accept an offer of settlement. Alleged fathers also were willing to pay something in settlement rather than incur the expense of a trial which had the potential for a finding of paternity and a support obligation far beyond the settlement figure. Some support was certainly better than none at all from the mother's point of view. The scientific developments in blood testing have made the settlement provisions of paternity laws far less attractive or necessary.

Conceivably, though, there could still be instances where it would be to the advantage of the mother and the child to settle without a finding of paternity. For example, the mother might begin a new relationship with someone who desires to provide support for the child and possibly wishes to adopt the child. We note that execution of a consent to adopt by the respondent was one of the settlement provisions in this case. Add to these considerations those of the *Mills* Court:

> "It requires little experience to appreciate the obstacles to such suits that confront unwed mothers during the child's first year. Financial difficulties caused by childbirth expenses or a birth-related loss of income, continuing affection for the child's father, a desire to avoid disapproval of family and community, or the emotional strain and confusion that often attend the birth of an illegitimate child all encumber a mother's filing of a paternity suit within 12 months of birth." *Mills*, 456 U.S. at 100, 71 L. Ed. 2d at 778, 102 S. Ct. at 1555.

These same concerns are present for the mother who contemplates the decision of whether to pursue a finding

of paternity and support or opt for an out-of-court settlement guaranteeing some level of support.

In *Pickett v. Brown* (1983), 462 U.S. 1, 76 L. Ed. 2d 372, 103 S. Ct. 2199, the Supreme Court struck down Tennessee's two-year statute of limitations for paternity suits brought on behalf of illegitimate children. In view of the unfavorable treatment accorded illegitimate children historically, the Court indicated that such statutory classifications are subject to a heightened level of scrutiny. The Court found that although not subject to strict scrutiny, " 'a classification based on illegitimacy is unconstitutional unless it bears "an evident and substantial relation to the particular ... interests [the] statute is designed to serve." ' " *Pickett,* 462 U.S. at 8, 76 L. Ed. 2d at 379, 103 S. Ct. at 2204, quoting *United States v. Clark* (1980), 445 U.S. 23, 27, 63 L. Ed. 2d 171, 177, 100 S. Ct. 895, 899.

In *Pickett,* Tennessee attempted to treat two groups of illegitimate children differently. The statute allowed suit to be brought on behalf of illegitimate children who were public charges until the child's 18th birthday while other illegitimate children had only the two-year statute of limitations period. The State argued that such a distinction was justified by the State's interest in protecting public revenue. (*Pickett,* 462 U.S. at 14, 76 L. Ed. 2d at 383, 103 S. Ct. at 2207.) We note with interest that Tennessee perceived that its interest in protecting public revenue was greater than its interest in preventing the prosecution of stale or fraudulent claims.

Again, in *Clark v. Jeter* (1988), 486 U.S. 456, 100 L. Ed. 2d 465, 108 S. Ct. 1910, the Supreme Court struck down Pennsylvania's six-year statute of limitations for paternity actions on equal protection grounds. The Court again identified intermediate scrutiny as the proper level of scrutiny to be applied to discriminatory classifications based on illegitimacy. (*Clark,* 486 U.S. at 461, 100 L. Ed. 2d at 472, 108 S. Ct. at 1914.) One reason the Court found

that the six-year limitations period was not substantially related to Pennsylvania's interest in avoiding the litigation of stale or fraudulent claims was the fact that the legislature had enacted an 18-year statute of limitations for paternity and support actions in 1985, albeit under the threat of losing Federal funds. (*Clark*, 486 U.S. at 462, 100 L. Ed. 2d at 472, 108 S. Ct. at 1914-15.) The Court saw that enactment as a "tacit concession that proof problems are not overwhelming." *Clark*, 486 U.S. at 465, 100 L. Ed. 2d at 474, 108 S. Ct. at 1916.

The *Clark* Court referred to the legislative history of the Federal Child Support Enforcement Amendments, where Congress recognized that increasingly sophisticated tests for genetic markers permit the exclusion of over 99% of those who might be accused of paternity, regardless of the age of the child, another "reason to doubt that Pennsylvania had a substantial reason for limiting the time within which paternity and support actions could be brought." *Clark*, 486 U.S. at 465, 100 L. Ed. 2d at 474, 108 S. Ct. at 1916.

This line of cases from the Supreme Court set the stage for its remand of the *Gerhardt* case to the Supreme Court of Wisconsin. (*Gerhardt v. Estate of Moore* (1988), 486 U.S. 1050, 100 L. Ed. 2d 915, 108 S. Ct. 2814.) The fact situation in *Gerhardt* was very similar to our case, except there was an admission of paternity in *Gerhardt*. The primary issue on remand was whether under *Clark* a statutory provision denying nonmarital children involved in lump-sum child support settlements the ability to seek additional support from their fathers imposed an unconstitutional deprivation that was not shared by marital children in violation of the equal protection clause. Although the Wisconsin Supreme Court had originally upheld the legislation at issue, on remand that court found the legislation to be a denial of equal protection. *Gerhardt v. Estate of Moore* (Wis. 1989), 441 N.W.2d 734.

Applying the intermediate level of scrutiny, the Wisconsin court found that the State's interest in finality and promoting settlements did not outweigh the equal protection problems presented by the statutory scheme. That court said that the lump-sum settlement provision was an option "that has in reality worked to the detriment of many nonmarital children. It is, at best, an illusory benefit amounting to no benefit at all." (*Gerhardt*, 441 N.W.2d at 738.) The court compared the bar to seeking additional child support to the statutory limitation bars to filing actions discussed above. The court found them to be nearly identical because, "[r]egardless of the label attached to the statutory bar, *** [t]he nonmarital child, unlike the marital child, is barred from seeking additional support, regardless of need. That is hardly fair to the nonmarital child, much less constitutional. That is what the United States Supreme Court recognized in remanding this action ***." *Gerhardt*, 441 N.W.2d at 738.

We agree with the analysis of the Supreme Court of Wisconsin and find that a settlement order entered pursuant to the settlement provisions of a paternity statute should not bar a subsequent support action brought on behalf of a nonmarital child. In accordance with the above analysis, we hold that equal protection of the law would be violated if a right to seek support from their parents during the whole of their minority were granted to marital children but denied to nonmarital children.

We do not, however, find the present statutory scheme in Illinois pertaining to settlement of paternity actions unconstitutional. The Illinois Parentage Act, regarding actions filed subsequent to a settlement, states: "Regardless of its terms, an agreement, other than a settlement approved by the court, between an alleged or presumed father and the mother or child, does not bar an action under this Section." (Ill. Rev. Stat. 1989, ch. 40, par. 2507(d).) The Act further specifies in section 12.1: "Notwithstand-

ing subsection (d) of Section 7 of this Act, neither the entry of a settlement order, nor the terms of a settlement order shall bar an action brought under this Act by a child to ascertain paternity." Ill. Rev. Stat. 1989, ch. 40, par. 2512.1.

The language of the statute is clear that a child can bring an action to ascertain paternity anytime during the limitations period. (See Ill. Rev. Stat. 1989, ch. 40, par. 2508(a)(1).) The appellate court interpreted this provision to mean that an action to modify support or to obtain additional support is prohibited. We disagree with the appellate court's interpretation. Our interpretation of the statute is aided by reviewing the intent of the legislature regarding parental support for minors.

As stated in its title, the purpose of the Paternity Act (Ill. Rev. Stat. 1983, ch. 40, par. 1351 *et seq.*) was "to provide for the liability of the parents of such children," which liability was as follows:

"§2. The father of a child born out of wedlock whose paternity is established in a proceeding under this Act shall be liable for its support, maintenance, education and welfare, until the child's attainment of age 18 or until the child is legally adopted, to the same extent and in the same manner as the father of the child born in lawful wedlock is liable for its support, maintenance, education and welfare.

The mother of a child born out of wedlock shall also be liable for its support, maintenance, education and welfare to the same extent as if the child had been born in lawful wedlock." Ill. Rev. Stat. 1983, ch. 40, par. 1352.

Similarly, the Illinois Parentage Act, which replaced the Paternity Act, set forth the public policy of the State:

"§1.1 Public Policy. Illinois recognizes the right of every child to the physical, mental, emotional and monetary support of his or her parents under this Act." Ill. Rev. Stat. 1989, ch. 40, par. 2501.1.

Finally, one of the underlying purposes of the Illinois Marriage and Dissolution of Marriage Act is to "make rea-

sonable provision for spouses and minor children during and after litigation." (Ill. Rev. Stat. 1989, ch. 40, par. 102(5).) Thus, the intent of the legislature to provide parental support for all minor children, whether marital or nonmarital, is very clear. Legislative common sense dictates that if parents do not support their children, an already strained State welfare system must do so.

In weighing the opposing State interests, the appellate court concluded that the Parentage Act's purpose of "securing finality" outweighs the interest of nonmarital children in pursuing monetary support from their parents. The court also concluded that ascertaining the identity of the father, without the benefit of seeking support from him, is not a meaningless remedy because the child is then entitled to seek inheritance rights and certain governmental benefits in the future. We find these conclusions are contrary to the stated purpose of the Parentage Act and the public policy of this State. Thus, we interpret section 12.1 of the Parentage Act, which allows a child to bring an action to ascertain paternity, to also allow that child to bring an action seeking support from his or her parents. To find otherwise would be to denigrate the clearly expressed intent of the legislature as well as the public policy of the State.

Accordingly, the judgment of the appellate court is reversed, and the cause is remanded to the circuit court of Tazewell County with directions to ascertain paternity and proceed in accordance with this opinion.

*Appellate court reversed;*
*remanded with directions.*