KEITH WILLERTON, APPELLANT, *v.* ZACHARY BASSHAM, A MINOR, BY THE WELFARE DIVISION, STATE OF NEVADA, DEPARTMENT OF HUMAN RESOURCES, GUARDIAN AD LITEM, PEGGY BASSHAM AND COUNTY OF SONOMA, STATE OF CALIFORNIA, RESPONDENTS.

No. 23328

January 24, 1995                                             889 P.2d 823

*Scarpello & Alling* and *Rick Oshinski,* Stateline, for Appellant.

*Scott Doyle,* District Attorney and *Robert W. Story,* Chief Deputy District Attorney, Douglas County, for Respondents.

## OPINION

By the Court, SHEARING, J.:

In 1981 Peggy Bassham (Peggy), the County of Sonoma, State of California (Sonoma) and Zachary Bassham (Zachary), through his guardian ad litem, the Welfare Division of the State of Nevada, Department of Human Resources (collectively respondents), sued Keith Willerton (Keith). Respondents sought to establish the paternity of Zachary, to compel support for Zachary and to require Keith to repay to Sonoma the costs of support paid to Peggy in the form of public assistance payments. In July 1982 the parties settled the suit by entering into a stipulation (the agreement) to compromise the suit under NRS 126.141(1)(b). The agreement provided that paternity would not be determined, at least with regard to the formal record.[1]

In addition, the agreement provided that Keith would pay to Peggy $150 per month "as and for the ongoing support" of Zachary and would repay Sonoma in monthly payments for the public assistance grants and the cost of blood testing. On July 12, 1982, the district court approved the agreement and entered an

---

[1]The agreement, in relevant part, provided:
   8. Parties agree that the Court may, at [the preliminary] hearing, make a determination as to the paternity of plaintiff ZACHARY BASSHAM, a minor. However, said determination of paternity shall not be entered upon the record of the within proceedings or be published as a part of the official file of this matter, but shall be kept confidential in accordance with NRS 126.111 and 126.141. The results of the determination of paternity shall be sealed by the Clerk of the Court in the within action and shall not be published or unsealed until the death of defendant KEITH WILLERTON or upon his refusal to make the aforesaid monthly payment.

The court made a determination regarding paternity, but sealed the order in accordance with the agreement. We do not intend to imply in any fashion that the court found Keith to be the natural father of Zachary. The order determining paternity was sealed and the conditions precedent to the unsealing of that order have not been met. Neither party has challenged the order or the terms setting conditions on the unsealing of the order. Accordingly, we make no reference to the contents of the order and no ruling or decision on the validity of the order or the conditions stated regarding the unsealing of the order.

order declaring judgment in favor of Peggy and Sonoma as to the support and reimbursement provisions. The court did not address paternity. On the same day the district court sealed the entire file relating to the case, including the Complaint and Answer and the agreement. The file was only to be opened "upon a showing by any interested party of the death of defendant KEITH WILLERTON, or upon a refusal of [WILLERTON] to make the monthly payments heretofore ordered by this Court."

Keith filed a motion in the district court nine years later to reduce the two orders to a formal judgment. He apparently did so in response to an earlier request by the Douglas County District Attorney's office to unseal the file to determine whether the support provisions of the order should be modified in accordance with Nevada law.[2] On October 9, 1991, the district judge granted Keith's motion and entered judgment, stating that "[j]udgment be and hereby is entered in accordance with the Order of July 12, 1982 and the Order Sealing File of July 12, 1982. This is a Final Judgment."

On February 12, 1992, Peggy and Zachary brought suit in the Superior Court of California seeking to establish the paternity of Zachary and to compel support for Zachary. The Superior Court sustained Keith's demurrer and dismissed Peggy and Zachary's suit without prejudice. Keith then moved the Nevada district court for an order declaring its October 1991 judgment and July 1982 court orders to be binding and non-modifiable under the doctrine of res judicata. The district judge denied Keith's motion, ruling that

> a careful and confidential review of the aforesaid Stipulation and its terms, and the various pleadings and papers sealed therewith pursuant to order of this court dated July 12, 1982 . . . reveals that, because the parties chose to resolve their disputes by compromise agreement as provided for in N.R.S. 126.141(1)(b), this Court did not then, nor has it to

---

[2]NRS 125B.145, part of Nevada's Obligation of Support Act, provides, in relevant part, as follows:

> 1. An order issued by any court or expedited process for the support of a child that is being enforced in this state must be reviewed by the court at least every 3 years pursuant to this section to determine whether the order should be modified or adjusted. If the court determines that modification or adjustment of the order is appropriate, the court shall enter an order modifying or adjusting the previous order for support.

In 1990 the D. A. moved for an order unsealing the file to investigate the possibility of modifying the "support" provisions, but the motion was withdrawn after it was discovered that none of the parties was then residing within the jurisdiction of the court.

date, finally determined the existence or non-existence of paternity. Therefore, res judicata does not act to bar the Superior Court of California, County of Sonoma, from making such a determination.

The court also stated that the support provisions enshrined in the order and based on the agreement were modifiable to the extent permitted by NRS 126.191.[3] Keith appealed.

On appeal, Keith contends that the bar and merger principles of res judicata preclude any further litigation on the same claims or causes of action as those interposed in the Complaint originally filed in Nevada district court, which claims were disposed of through a compromise agreement provided for by statute. The Douglas County District Attorney, representing Peggy and Zachary, focuses on the support provisions of the judgment and contends that all provisions in court orders that provide for the financial support of a minor child are reviewable every three years under Nevada law, and that a prior consent judgment may not bar the review and modification of such an order by a court.

Resolution of the issue presented in this case involves an examination of Nevada's Parentage Act, NRS 126.011 *et seq.*, and Nevada's Obligation of Support Act, NRS 125B.010 *et seq.*, as well as the general principles of res judicata urged by the parties. The precise issue may be stated as follows:

> Does a stipulated compromise agreement in an action to determine paternity and to compel child support, which has been approved by the court and incorporated in a court order and which later forms the basis for the judgment of the court, preclude a later action by either the mother or child, or both, to determine paternity and compel support or to modify the support provisions of the order?

We conclude that a consideration of the policies and purposes behind the applicable acts requires a departure from the otherwise appropriate application of the bar and merger principles of res judicata to preclude an action by Zachary to determine paternity and compel support and an action by Zachary or the State to modify support. Specifically, we hold that the principles of res judicata bar Peggy from reasserting an action to determine paternity or compel support, but that Zachary is not so barred. In addition, Zachary or the State may seek to modify the provisions

---

[3]This statute provides:

**126.191. Modification or revocation of judgment or order.** Except as otherwise provided in NRS 125B.140, the court has continuing jurisdiction to modify the judgment or order as to custody, visitation or support.

of a compromise agreement intended to provide Zachary with support to the extent that the judgment or order is being enforced in this state, and the state of Nevada may provide that all such orders are modifiable. We also hold that nothing in Nevada's Parentage Act bars Zachary or an appropriate public agency in another state from seeking to compel additional support in a later action instituted in another state.

The agreement was entered into and approved by the court under NRS 126.141 which provides as follows:

### 126.141 Pretrial recommendations.

1. On the basis of the information produced at the pretrial hearing, the judge, master or referee conducting the hearing shall evaluate the probability of determining the existence or nonexistence of the father and child relationship in a trial and whether a judicial declaration of the relationship would be in the best interest of the child. On the basis of the evaluation, an appropriate recommendation for settlement must be made to the parties, which may include any of the following:

(a) That the action be dismissed without prejudice.

(b) That the matter be compromised by an agreement among the alleged father, the mother and the child, *in which the father and child relationship is not determined* but in which a *defined economic obligation,* fully secured by payment or otherwise, is undertaken by the alleged father in favor of the child and, if appropriate, in favor of the mother, subject to approval by the judge, master or referee conducting the hearing. In reviewing the obligation undertaken by the alleged father in a compromise agreement, the judge, master or referee conducting the hearing shall consider the best interest of the child, discounted by the improbability, as it appears to him, of establishing the alleged father's paternity or nonpaternity of the child in a trial of the action. In the best interest of the child, the court may order that the alleged father's identity be kept confidential. In that case, the court may designate a person or agency to receive from the alleged father and disburse on behalf of the child all amounts paid by the alleged father in fulfillment of obligations imposed on him.

(c) That the alleged father voluntarily acknowledge his paternity of the child.

2. If the parties accept a recommendation made in accordance with subsection 1, judgment may be entered accordingly.

. . . .

4. The guardian ad litem may accept or refuse to accept a recommendation under this section.

(Emphasis added.) There is no indication in the record that the judge recommended the settlement to the parties, and the parties have not included the findings of the court regarding the best interest of Zachary, if in fact the judge made any such findings. There is no transcript in the record of any hearings held before the judge wherein Zachary's "best interest" was ever discussed or considered. Nonetheless, the compromise agreement was approved and an order and judgment were entered in accordance with its terms.

Generally, a judgment entered by the court on consent of the parties after settlement or by stipulation of the parties is as valid and binding a judgment between the parties as if the matter had been fully tried, and bars a later action on the same claim or cause of action as the initial suit. *See* Sheldon R. Shapiro, Annotation, *Modern Views of State Courts as to Whether Consent Judgment is Entitled to Res Judicata or Collateral Estoppel Effect,* 91 A.L.R.3d 1170, 1173, 1176 (1979) (citing dozens of state court decisions for the proposition that "a valid consent judgment is entitled to res judicata effect, so as to preclude relitigation of the *same claim or cause of action* as was covered by such judgment") (emphasis added); *see also* Fleming James, Jr., *Consent Judgments as Collateral Estoppel,* 108 U. Penn. L. Rev. 173, 173-74 & n.3 (1959) (recognizing that the merger and bar principles of res judicata preclude relitigation of *claims,* but arguing that consent judgments should not have collateral estoppel effects barring litigation of *issues* in separate action on different claim).[4]

The United States Supreme Court has recognized that prior stipulation-based judgments have preclusive effect as to later suits on the same claims or causes of action. In Lawlor v. National Screen Service, 349 U.S. 322, 326 (1955) the Court stated:

---

[4]*See also* Annotation, *Res judicata as affected by fact that former judgment was entered by agreement or consent—federal cases,* 93 L. Ed. 1188, 1190 (1950) ("As a general proposition, it is well settled that a valid judgment or a decree entered by agreement or consent operates as res judicata to the same extent as a judgment or decree entered after answer and contest . . . . In cases too numerous to be collected, the courts have applied the general rule without any discussion or statement thereof."); Comment Note, *Res judicata as subject to exception when its application would be opposed to public policy,* 88 L. Ed. 389, 389-90 (1944) ("It is, of course, presupposed that the judgment relied upon as res judicata would, under the ordinary rules prevailing in a particular jurisdiction, preclude any further litigation, the only question to be considered being whether these ordinary rules ought to give way to considerations of public policy.").

The basic distinction between the doctrine of res judicata and collateral estoppel . . . has frequently been emphasized. Thus, under the doctrine of *res judicata,* a judgment "on the merits" in a prior suit involving the same parties or their privies bars a second suit on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, such a judgment precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit.

*Id.* at 326 (citing Cromwell v. County of Sac, 94 U.S. 351, 352-53) (1877). The Court then recognized that a consent judgment "bars a later suit on the same cause of action," but found that the plaintiffs' second suit set forth different causes of action than the first suit. *Id.* at 327. For authority that a consent judgment bars a later suit on the same claim or cause of action, the Court cited United States v. International Building Co., 345 U.S. 502, 506 (1953). In *International Building,* the Court stated that a consent judgment (in that case a stipulation-based tax court judgment) was "an absolute bar to a subsequent action on the same claim," but also stated that "where the second action . . . is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted." *Id.* at 505.[5]

Accordingly, we recognize that consent judgments do have res judicata effect on the parties to a consent judgment, barring a later suit on the same claims or causes of action as those asserted in a prior proceeding.[6]

---

[5]*See also* Nevada v. United States, 463 U.S. 110, 129-30, 132 (1982) (settlement decree was final judgment precluding assertion of same claims or causes of action as first lawsuit).

[6]In Geissel v. Galbraith, 105 Nev. 101, 104, 769 P.2d 1294, 1296 (1989), this court stated that "a judgment pursuant to stipulation of the parties does not have a *res judicata* effect." (citing United States v. International Building Co., 345 U.S. 502, 505-506 (1953); In Re Daley, 776 F.2d 834, 838 (9th Cir. 1985); Chaney Bldg. Co. v. City of Tucson, 716 P.2d 28, 30 (Ariz. 1986); Rajspic v. Nationwide Mut. Ins. Co., 662 P.2d 534, 537 (Idaho 1983); Am. Mut. Liability Ins. Co. v. Mich. Mut. Liability Co., 235 N.W.2d 769, 776 (Mich. Ct. App. 1975)).

Each of the cases cited as authority in *Geissel* stated the general rule that stipulation-based judgments do have preclusive effect as to the same claim or cause of action, but also held that such judgments do not have preclusive effect as to matters placed in issue but not actually decided.

It seems apparent that this court used "res judicata" in *Geissel* in its broadest sense to indicate preclusive effect generally. *See, e.g.,* Lawlor v. National Screen Service, 349 U.S. 322, 327 n.6 (1955) (noting that the term res judicata may generally be used to refer to both the merger and bar

In the instant case, the district court ruled that the issue of paternity had not actually been litigated and that a later action seeking to determine paternity was therefore not barred by the doctrine of res judicata. While it is true that paternity was not actually litigated, this fact has significance only insofar as the judgment would therefore not have collateral estoppel effect as to the issue of paternity in a later suit between the parties on a different claim or cause of action. In the suit filed by Peggy and Zachary in California, their claims and causes of action were identical as those interposed in the first action filed in Nevada: to determine paternity and compel support. Accordingly, the general rule stated above, which concerns the res judicata effect of a prior judgment and not the collateral estoppel effect of a prior judgment, *would* operate to bar their subsequent suit.

However, that does not end our analysis, as there is a recognized public policy exception to the application of the principles of res judicata. *See Modern Cases,* 91 A.L.R.3d at 1180 (noting that "modern cases have recognized that where it would be contrary to public policy to grant res judicata effect to particular consent judgments, such consent judgments will be denied res judicata effect"); Comment Note, *Res judicata as subject to exception when its application would be opposed to public policy,* 88 L.Ed. at 389, 390 (1944) (noting that "a few courts have . . . recognized that there may exist situations in which the doctrine will yield to considerations of public policy other than those underlying the doctrine"); *see also* Varsity Amusement Company v. Butters, 394 P.2d 603, 607 (Colo. 1964) (holding that application of res judicata to prior consent judgment would preclude injured worker's full compensation under workers' compensation statute and refusing to give prior consent judgment res judicata effect).

The author of the Comment Note cited above recognized that "in most cases recognizing, on grounds of public policy, an exception to the rules of res judicata, the controversy . . . which under the general rules would have been concluded by a former judgment has not been actually litigated and determined by such judgment." 88 L.Ed. at 390.

We discern an exception to according res judicata effect to a

principles of claim preclusion and the direct and collateral estoppel effects of issue preclusion, and noting such usage by the American Law Institute in the Restatement (First) of Judgments.) To the extent that the rule of law stated in *Geissel* is inconsistent with this opinion and the authority cited herein, *Geissel* is now modified to indicate that prior stipulation-based judgments do have res judicata (claim preclusion) effect, but do not have collateral estoppel (issue preclusion) effect.

prior judgment when to accord such preclusive effect would contravene an important public policy, particularly when the judgment was entered after stipulation or settlement. We therefore consider whether the policies behind affording preclusive effect to a compromise agreement in a paternity claim should yield to the important policies recognized in Nevada's Parentage Act—including the compromise provision at issue—and Nevada's Obligation of Support Act.

The principles of res judicata are based in part upon the public policies of putting an end to litigation and lending stability to judgments rendered by courts, therefore inspiring confidence in our civil justice system. *See* Comment Note, *Res judicata as subject to public policy exception,* 88 L.Ed. at 389; Matter of Paternity of JRW, 814 P.2d 1256, 1264 (Wyo.1991) (noting also the policies of avoiding vexatious and costly piecemeal litigation and conserving judicial resources). Keith asserts that these policies are dispositive and that a prior stipulation-based paternity judgment must be given preclusive effect.

We note, however, that the Uniform Parentage Act (the model act), drafted in 1973 by the National Conference of Commissioners on Uniform State Laws (the National Conference), *see* Uniform Parentage Act, 9B U.L.A. §§ 1-22 at 287, 287-346 (Master ed. 1987 & 1993 Cum. Supp.), and Nevada's version of the model act are also based on substantial policy considerations. These acts were drafted and adopted to address serious shortcomings in the unequal legal treatment of illegitimate children and are based on compelling social policies.

The model act was promulgated in response to a series of United States Supreme Court decisions that characterized "the bulk of [then] current law on the subject of children born out of wedlock [as] either unconstitutional or subject to grave constitutional doubt." 9B U.L.A. Prefatory Note at 288. The model act may broadly be stated as addressing the Supreme Court's recognition that "the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution mandated equal legal treatment of legitimate and illegitimate children in a broad range of substantive areas." *Id.* The provisions of the act are "largely concerned with the *sine qua non* of equal legal rights— the identification of the person against whom these rights may be asserted. In the context of the child born out of wedlock that person is the father." *Id.* The prefatory remarks to the model act also indicate that "it is expected that this Act will fulfill an important social need in terms of improving the states' systems of

support enforcement." *Id.* In addition, an overarching purpose of the model act and most state acts modelled thereon is to identify the party upon whom a support obligation may be imposed so that illegitimate children will not become wards of the state, *see, e.g.,* Fink v. Roller, 448 N.E.2d 204, 207 (Ill. App. Ct. 1983), and to reduce a moral obligation of support into a legal obligation. *See* Cessna v. Montgomery, 344 N.E.2d 447, 456 (Ill. 1976).

These policies are sufficiently important to warrant an examination into whether a prior stipulation-based judgment should be accorded preclusive effect as to the mother, the child or the State, so as to preclude any further action to determine paternity or compel or modify provisions in a compromise agreement intended to provide for the financial support of a minor child.

Keith asserts that the specific purpose of the compromise provision of the Parentage Act is to encourage alleged fathers to agree to a settlement when they would not otherwise do so, in the hope of obtaining a beneficial ruling with finality. His arguments assume that the purpose of the provision was to encourage the mother to accept a settlement despite the presence of weak evidence of paternity. We are not convinced that this is the purpose of the compromise provision.

When the Nevada Legislature enacted its Parentage Act in 1979 it drew largely from the model act drafted by the National Conference. The Nevada Legislature adopted the "Pre-trial Procedures" provision of the model act, 9B U.L.A. §§ 10-13, verbatim in enacting Nevada's "Pre-trial recommendations" provision, NRS 126.141. It is within this statutory provision that the compromise mechanism is found.

The comments to the model act indicate that the drafters of that act envisioned the pretrial procedure as a device to dispose of *most* paternity actions, primarily to avoid "inconvenience and embarrassment." 9B U.L.A. § 10, cmt ("Sections 10 through 13 provide details concerning the pre-trial hearing. The purpose of the pre-trial hearing is to *minimize inconvenience and embarrassment* in the *many* cases which the Committee expects will be resolved on the basis of voluntary compromise contemplated by Section 13.") (emphasis added). The comment to section 13 states that "[t]he settlement procedures contemplated by this Section are voluntary . . . . It is expected, however, that, as soon as reliable blood test evidence becomes available on a large scale, the *great majority of cases* will be settled consensually *in the light of such evidence.*" *Id.* § 13 (emphasis added).[7]

---

[7]The prefatory remarks to the model act also state that "[n]oteworthy is the pre-trial procedure envisaged by the Act which, the Committee expects, will greatly reduce the current high cost and inefficiency of paternity litiga-

It seems apparent, then, that the drafters of the model act envisioned widespread settlement of paternity claims on the basis of the strength and accuracy of blood test evidence, not based upon the mother's willingness to accept a final settlement agreement where the chances of establishing paternity at trial are weak or precarious. The facts of the instant case illustrate this result. The blood tests conducted during the pretrial proceedings were compelling evidence that Keith might be the father. In the interpretation of blood test results, the results indicated a strong probability that Keith, as compared to the average random Caucasian male, was the father of Zachary.

If practice follows theory, and most paternity claims *are* to be settled on the basis of strong evidence, as in the instant case, then the statute would tip overwhelmingly in the alleged father's favor if given preclusive effect on both the issue of paternity and the nonmodifiability of the order. The alleged father would be able to secure a favorable ruling on paternity (a non-determination) even in the face of compelling evidence, and would also secure a "frozen" obligation of support. The mother and child would obtain support but without the option to modify the order. These results would obtain from a desire to avoid the "inconvenience and embarrassment" (whose we are not advised) of trial.

With this as background, we analyze each party's interest in prosecuting a paternity action and seeking to compel support. We discern no persuasive reason why affording preclusive effect to a compromise agreement with the mother would contravene the policies of the act in any substantial fashion with regard to the determination of paternity. Unlike the child, the mother has no additional rights flowing from a determination of paternity beyond the right to receive support for the care of the minor child. If the support provisions are modifiable under the policies of Nevada's Obligation of Support Act, *see infra,* then there is no independent reason why the mother should retain a right to reinstitute suit on the issue of paternity. Accordingly, a stipulation-based judgment entered into as a result of the compromise procedure of NRS 126.141(1)(b) is binding on the mother and precludes a later action asserting a claim or cause of action to determine paternity.

A minor child, however, has legal interests that flow from a

tion." 9B U.L.A., Prefatory Remarks at 289. The pre-trial procedures in both the model act and Nevada's act provide that the judge may also recommend voluntary acknowledgment of paternity or dismissal with prejudice, again presumably based on the strength and accuracy of blood test results, thereby saving the expense of trial.

determination of paternity beyond the right to collect support. Such interests include the right to prosecute an action for wrongful death, a claim under a workmen's compensation act and the right to an inheritance. *See, e.g.,* Harold C. Havighurst, *Settlement of Paternity Claims,* 1976 Ariz. St. L.J. 461, 469 (citing cases and stating that it "appears that the answer should be in the negative" when presented with the question whether a prior settlement of a claim for support against a man who denies paternity should be binding upon a minor child). In addition, there is a real dignitary and psychological interest held by the child in being free to ascertain his or her heritage and lineage. For these reasons, we conclude that a minor child is not barred from instituting a later action to determine paternity when a prior action brought in his name has reached judgment through a stipulated agreement.

Keith argues that Zachary was represented by a guardian ad litem and that his interests were therefore properly protected. In addition, Keith points to the general provision of NRS 126.141(1) which allows settlement on the recommendation of the judge after the judge has determined "whether a judicial declaration of the relationship would be in the best interest of the child." Thus, Keith argues that Zachary's best interest was considered and that the compromise comported with that interest.

As stated, the judge either made no findings as to Zachary's best interest or the parties have simply failed to include such important findings in the record on appeal. There is also no evidence that the judge first "evaluate[d] the probability of determining the existence or nonexistence of the father and child relationship in a trial" and then made a determination that a judicial declaration of the relationship would not be in the best interest of the child. *See* NRS 126.141(1). It rather appears from the record that the parties decided to compromise their suit after receiving blood test results and presented their settlement to the court, which approved it routinely. We normally presume the regularity of district court proceedings in an appeal with an inadequate record. *See* Stover v. Las Vegas Int'l Country Club, 95 Nev. 66, 68, 589 P.2d 671, 674 (1979); City of Las Vegas v. Bolden, 89 Nev. 526, 527, 516 P.2d 110, 111 (1973). However, such a rule was not intended to benefit the party failing to build the record, and we cannot assume on this crucial issue that Zachary's best interest was appropriately considered and determined. In addition, the parties have utterly failed to address Zachary's best interest on appeal. We therefore hold that Zachary is not prevented from instituting a suit to determine paternity.

We also note that nothing in the act purports to give binding effect as to a child to compromise agreements under NRS 126.141(1)(b). In fact, the Nevada Legislature, when it passed the Nevada Parentage Act, deleted a provision from the model act which arguably may have had such an effect. The model act contained the following provision:

> **SECTION 6.   [Determination of Father and Child Relationship; Who May Bring Action; When Action May Be Brought.]**
>
> . . . .
>
> (d) Regardless of its terms, an agreement, *other than* an agreement approved by the court in accordance with Section 13(b) [the pretrial procedures compromise provision], between an alleged or presumed father and the mother *or child,* does not bar an action under this section.

9B U.L.A. § 6 at 302-03. The Nevada Legislature deleted this provision entirely from its Parentage Act (as did the legislatures of California and Hawaii, *see* 9B U.L.A. at 303-05). Although we do not speculate as to the import of this provision in a state that has retained it, we note that it arguably implies that compromise agreements under the pretrial procedures provision are binding. It is significant that the Nevada Legislature deleted this provision.

In addition, the legislatures of other states have recognized the policy behind allowing children to seek a determination of paternity even after a compromise agreement between all the parties has been approved by the judge or referee and reduced to judgment. The Illinois Legislature passed the Illinois Parentage Act in 1984, and in its present incarnation adopted section 6(d), worded in substantially the same language as the model act. *See* Ill. Ann. Stat. ch. 45, § 7(d) (1993) ("Regardless of its terms, an agreement, *other than a settlement approved by the court,* between an alleged or presumed father and the mother or child, does not bar an action under this section.") (emphasis added). Notwithstanding this language, the legislature included the following provision in its "Settlement orders" provision:

> Notwithstanding subsection (d) of Section 7 of this Act, neither the entry of a settlement order, nor the terms of a settlement order shall bar an action brought under this Act *by a child to ascertain paternity.*

Ill. Ann. Stat. ch. 45, § 12.1 (Smith-Hurd 1993) (emphasis added); *see also* Wash. Rev. Code Ann. § 26.26.060(3) (West 1986 & Supp. 1994) (providing that "no agreement between an alleged or presumed father and the mother or child, shall bar an action under this section [determination of father and child rela-

tionship]''); Ohio Rev. Code Ann. § 3111.04(B) (Page 1989 & Supp. 1993) (providing that ''[a]n agreement does not bar an action under this section''). We cite these provisions only to illustrate that other states have recognized the policy of refusing to accord res judicata effect to a compromise agreement as to a minor child. In addition, the above language in the Illinois statute was construed to allow a child to ascertain paternity *and* increase the support obligation previously agreed to in a court-approved compromise agreement between the mother and father. *See* Department of Public Aid ex rel. Cox v. Miller, 586 N.E.2d 1251, 1256-57 (Ill. 1992).

In addition, commentators have recognized that a minor child may not be or should not be bound by a consent judgment in the same manner as the mother or other interested parties. *See* 4 Family Law and Practice § 63.03[5] at 63-35 (Arnold H. Rutkin ed. 1993) (noting that ''[w]hether the child is, or is not, made a party to the agreement, the practitioner still should advise his or her client of the possibility that these agreements may not be binding on the child who subsequently files an action on his or her own behalf to establish paternity, mainly on public policy grounds''); *see also* Havighurst, *Settlement of Paternity Claims,* 1976 Ariz. St. L.J. at 469 (discussed *supra*).

We therefore hold that Zachary is not precluded from instituting a new suit to determine paternity even after a prior suit prosecuted in his name was settled by compromise agreement.

We now turn to the final issue in this case, whether a compromise agreement under NRS 126.141(1)(b) operates to render the provisions within the agreement providing for the support of a minor child non-modifiable. Keith asserts that were this court to find the amount of support agreed to in a compromise agreement modifiable, then alleged fathers would have little or no incentive to compromise prior to trial because the promise of securing a final, binding judgment thereby would be illusory. The state argues, on behalf of Zachary and Peggy, that all orders for the support of a minor child in Nevada must be reviewed every three years and modified if necessary.

We have discussed the policy behind the pretrial procedure and compromise mechanism, which appears to be the avoidance of unnecessary trials in the light of strong evidence obviating the need for full trial. If the majority of claims are to be disposed of through settlement based on strong evidence of paternity, then the state has a compelling interest in seeing that any provisions for the support of a child incorporated in such settlement agreements are modifiable. The alleged father would still avoid the ''inconvenience and embarrassment'' of trial, and would secure a non-

determination regarding paternity. Although a child may later seek to determine paternity, we have held that a mother may not. Accordingly, the promise of a beneficial resolution to the alleged father is not wholly illusory. In addition, the concerns asserted by Keith are those that have already been discussed as the general policies behind the principles of res judicata—the security of a final judgment. We have weighed those interests against the interests of a minor child in prosecuting a paternity action and have concluded that the interests of an alleged father in the finality of a compromise agreement must yield to the interests of a minor child in obtaining the privileges and advantages that inure to a determination of paternity. One of those privileges is adequate support from the father. It would be a curious interpretation of an act designed to achieve equality between legitimate and illegitimate children to deny the latter the ability to seek modification of an inadequate support judgment, while the former retains such right by statute.

Keith argues that the legislature's intent to make the support provisions of a compromise agreement nonmodifiable is evident from the applicable acts. We disagree. The parties entered into an agreement approved by the court requiring monthly payments of $150 "as and for the ongoing support" of Zachary. They also stated that the agreement was made pursuant to NRS 126.141(1)(b) and was contingent upon the judge's approval and entry of judgment in accordance with the statute. NRS 126.141(1)(b) provides that an alleged father entering into a compromise agreement shall undertake a "*defined economic obligation,* fully secured by payment or otherwise, . . . in favor of the child and, if appropriate, in favor of the mother."

Keith argues that the legislature would have used the word support if it intended chapter 125B of the Nevada Revised Statutes to apply to the "defined economic obligation" undertaken in a compromise agreement. The relevant provision reads: "An order issued by any court or expedited process for the support of a child that is being enforced in this state must be reviewed by the court at least every 3 years pursuant to this section to determine whether the order should be modified or adjusted." NRS 125B.145(1). "Expedited process" is defined as "a judicial or administrative procedure established by any state . . . to facilitate the collection of an obligation for the support of a child." NRS 125B.145(7). The relevant provision does speak to the enforcement of an order setting forth an obligation. Although the section requires modification of all orders or obligations for the support of a child, it is not plain and clear that an order requiring an alleged father to pay a defined obligation is also not an order or obligation "for the support of a child."

When the meaning of a word used in a statute is not plain, clear and unambiguous its meaning may be sought by examining the context and policy of the law and the statute should be construed so as to avoid absurd results. *See* Welfare Div. v. Washoe Co. Welfare Dep't, 88 Nev. 635, 637-38, 503 P.2d 457, 458-59 (1972); *see also* City of Las Vegas v. Macchiaverna, 99 Nev. 256, 257-58, 661 P.2d 879, 880 (1983) (recognizing rule, but finding statute unambiguous).

We have already discussed the policies behind the model act and the parentage acts in states following the model act, which include avoiding the placement of a child on the welfare rolls and assigning moral responsibility on parents for the adequate support of minor children. If a great majority of cases is expected to be disposed of on the strength of reliable and accurate evidence simply to avoid the inconvenience and embarrassment—and indeed the expense—of trial, it seems incredible that the legislature intended that none of the protections in NRS 125B would apply to a court order based on an encouraged compromise that in form and substance provides for the financial support of a minor child. The Obligation of Support Act concerns not only the modification of support orders but the ability of the state to pursue remedies for the nonpayment of such obligations. *See* NRS 125B.150-.170. We think it would be an unintended and absurd result to preclude the state from insuring that "defined economic obligations" are modified and enforced in the same manner as other agreements for the financial support of children.

Keith also argues that NRS 125B.010 renders the entire chapter inapplicable to alleged fathers who enter into a compromise agreement. NRS 125B.010 provides that "[t]he provisions of this chapter [Obligation of Support] apply to all *parents* of all children, whether or not legitimated." (Emphasis added.) Since Keith has not been adjudicated a parent, he reasons, no provisions of the act apply to him or to the obligation he agreed to, even though Keith recognized such obligation to be for the support of Zachary. At first glance, an application of the statute by its literal terms and plain meaning supports Keith's argument. As with Keith's other statutory argument, however, we conclude that to apply the act according to the literal meaning would reach an unintended and absurd result. We therefore decline to hold that compromise agreements are immune from the reach of NRS 125B.

Accordingly, we hold that the provisions of 125B mandating periodic review of orders for the support of a child apply to the provisions of a compromise agreement entered into pursuant to NRS 126.141(1)(b). Even if we were to conclude that NRS 125B by its plain language did not apply directly to the defined economic obligation undertaken pursuant to NRS 126.141, we would

still recognize the policy behind NRS 125B as a valid basis for not affording res judicata effect to a compromise agreement insofar as the agreement addressed the obligation to provide financial support to a minor child. Thus, whether we conclude that the statute operates directly, or as an exception to the application of res judicata principles, the support provisions of a compromise agreement would either be modifiable or subject to readjudication in a later suit, with the same probable result.

We therefore affirm the order of the district court denying Keith's motion to declare the district court's prior order and judgment non-modifiable.

STEFFEN, C. J., and YOUNG and SPRINGER, JJ., concur.

ROSE, J., concurring in part and dissenting in part:

NRS 126.141 was enacted over two decades ago to permit the court to initiate and approve compromise agreements to dispose of suits brought for support of children born out of wedlock. As the majority observes, it was to obviate the need for a trial when the evidence of paternity was strong. But, it was also to provide a mechanism to enable the mother and child to receive some assistance from the putative father by way of compromise when the evidence of paternity was weak. It permitted a mother and child to get "half a loaf" of claimed support rather than run the risk of none at all. Of course, this law was passed at a time when DNA testing was unknown and determining parentage was an inexact science. The law was enacted with the best interests of the child in mind.

The mother and child's guardian entered into such a stipulation for support in this case, obviating a formal determination of paternity, and the stipulation was approved by the district court. Although the record does not establish whether the district court initiated this compromise or specifically found that the agreement was in the interests of the child, we should presume that the law was followed and that the district court made the appropriate findings.

Now, the majority concludes that the stipulation and order were not conclusive on all parties and should be set aside because of present public policy reasons. The compromise and order confirming it benefited Zachary and his mother, and it is res judicata as to the issues determined as explained by the majority opinion, but we should not override the res judicata effect of this judgment because of a present day public policy that cuts differently than a public policy that existed twenty years ago. The comments of the model Parentage Act cited by the majority foresaw the future when it was stated that the great majority of

cases will be settled consensually "as soon as reliable blood test evidence becomes available on a large scale." 9B U.L.A. § 13. The model act did not contemplate that when this happened, all compromises would then be of no binding effect.

However, for the reasons expressed by the majority, I do believe that NRS 125B.010 does permit the modification of the obligation specifically undertaken by Willerton. I conclude that while paternity should not be determined for the sole basis of modifying the payment obligation, this obligation can be modified pursuant to NRS 125B.010, but such modification should take into account the policy reasons that permitted such a compromise, as well as the present status of the parties.