CREGO v COLEMAN

Docket No. 113485. Argued March 8, 2000 (Calendar No. 4). Decided
     July 31, 2000.

     In 1978, Phyllis R. Crego brought a paternity action in the Wayne Cir-
          cuit Court, alleging that Kermit L. Coleman was the father of her
          daughter. In 1980, the parties reached a nonmodifiable settlement
          agreement, through which the defendant agreed to pay weekly
          child support, but did not acknowledge paternity. The trial court
          approved the terms of the settlement under MCL 722.713; MSA
          25.493, and ordered defendant to pay weekly child support, pend-
          ing a formal recommendation from the friend of the court. The
          complaint was dismissed without determining the issue of pater-
          nity. In 1981, after receiving the friend of the court's support rec-
          ommendation, the trial court entered a permanent order. In the
          early 1990s, the plaintiff sought to modify the support order, but
          the trial court, Marianne O. Battani, J., dismissed the plaintiff's
          motion on the ground of res judicata. The Court of Appeals, D. E.
          HOLBROOK JR., P.J., and REILLY, J. (GRIFFIN, J., dissenting), affirmed,
          holding that the nonmodifiable settlement agreement was binding
          on the parties. It additionally rejected the plaintiff's claim that MCL
          722.713; MSA 25.493 was an unconstitutional denial of equal protec-
          tion to illegitimate children. 201 Mich App 443 (1993) (Crego I)
          (Docket No. 139068). In 1995, however, in Dones v Thomas, 210
          Mich App 674 (1995), the Court of Appeals reached the opposite
          conclusion, holding that the statute did violate the constitutional
          guarantees of equal protection because it authorized nonmodifiable
          child support awards in paternity actions, while child support
          awards in divorce actions always remain modifiable. In response to
          Dones, the plaintiff renewed her motion for modification of child
          support, and the trial court granted the motion, concluding that it
          was required to follow the decision in Dones. On appeal, the Court
          of Appeals, DOCTOROFF, P.J., and MACKENZIE and GRIFFIN, JJ., held
          that it would find the statute unconstitutional except that it was
          barred from doing so by MCR 7.215(H)(1), requiring the Court to
          follow Crego I, regardless of the Dones decision. 226 Mich App 815
          (1997) (Crego II) (Docket No. 192798). A special panel, NEFF,
          SAWYER, MCDONALD, and MURPHY, JJ. (FITZGERALD, J., concurring, and
          HOEKSTRA, P.J., and WHITBECK, J., dissenting), affirmed, holding that

MCL 722.13; MSA 25.493 was unconstitutional as a violation of the equal protection guarantees of the United States and Michigan Constitutions. 232 Mich App 284 (1998) (*Crego III*). The defendant appeals.

In an opinion by Justice MARKMAN, joined by Justices TAYLOR, CORRIGAN, and YOUNG, the Supreme Court *held*:

MCL 722.713; MSA 25.493 did not violate equal protection guarantees.

1. The repealed section of the Paternity Act at issue established a means of enforcing nonmodifiable child support agreements under certain circumstances. The statute was only relevant to nonmodifiable agreements where a paternity action was filed, the child's mother and putative father voluntarily entered into an agreement regarding child support in lieu of a judicial determination of paternity, the circuit court made a determination that the agreement secured adequate provision for the child's needs, and the agreement failed to include language preserving the right to modify support levels at a later time.

2. The Equal Protection Clauses of the United States and Michigan Constitutions do not prohibit the state from distinguishing between persons, but merely require that the distinctions that are made not be arbitrary or invidious. Where an equal protection claim alleges unconstitutional treatment on the basis of illegitimacy, the United States Supreme Court has held that a state may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally.

3. Whether rational-basis review or intermediate scrutiny applies depends on the characterization of the statutorily created classifications. A statute that differentiates on the basis of whether paternity has been ascertained warrants rational basis review; a statute that differentiates on the basis of illegitimacy warrants intermediate scrutiny. Neither characterization is unreasonable here.

4. Because the plaintiff does not argue that the statute is unconstitutional on its face, its constitutionality must be determined "as applied." At the time of the statute's application, it offered an additional and voluntary optional method of obtaining child support where failure to prove paternity would result in no child support.

5. The provision in controversy, like the overall Paternity Act, advances the underlying goal of providing support to children who might otherwise be left without support. Regardless of the characterization of the classifications created by the statute, it does not violate the constitutional guarantees of equal protection of the law. Viewing the statute as one that merely differentiates on the basis of whether paternity has been ascertained, it is rationally related to

the legitimate state interest of ensuring that minor children born out of wedlock are provided with support and education. Viewing the statute as one that distinguishes children on the basis of illegitimacy, its purpose of providing support for illegitimate children is an important, and even compelling, state interest and one that, as applied, substantially and directly advances that interest by providing an avenue to avoid problems associated with proving paternity, while still providing support for the child.

6. Parties to judicially approved agreements order their conduct in reliance on those agreements. Allowing parties to avoid settlement agreements on the basis of advances in technology will undermine confidence in the legal system. Further, if such agreements may be modified where technological advances are utilized to prove paternity, then those same technological advances may also be utilized to *disprove* paternity and eliminate a putative father's support obligation, undermining the goal of obtaining child support.

Reversed and remanded.

Justice KELLY, joined by Justice CAVANAGH, dissenting, stated that the Paternity Act, before being amended, impermissibly discriminated against illegitimate children by denying them the opportunity accorded legitimate children for modification of agreements providing for their support.

It is not equally reasonable to apply the rational basis standard of review to § 3 as to apply an intermediate or heightened scrutiny standard. Intermediate or heightened scrutiny applies to claims of disparate treatment based on the legitimacy or illegitimacy of a person. It is unreasonable to find that the statute did anything except distinguish the treatment of children on the basis of legitimacy. Although not all illegitimate children received disparate treatment under § 3, the dominant reality is that illegitimate children, and they alone, received disparate treatment. Even though § 3 did not include every illegitimate child, intermediate scrutiny must apply where the statute affected any child's right to receive parental support on the basis of illegitimacy. Accordingly, intermediate or heightened scrutiny should be the only standard used in considering the constitutionality of § 3.

In order to survive intermediate scrutiny, a statute that results in the treatment complained of must be substantially related to an important government objective. While the state's interest in enhancing the opportunity for illegitimate children to obtain support from their fathers is an important objective, § 3 is not substantially related to that purpose. Statutes such as § 3 violate an illegitimate child's right to equal protection of the law. Section 3 actually

limited the opportunities for illegitimate children to receive support from their putative fathers by foreclosing any opportunity for support orders to be modified beyond what was agreed to under conditions very likely unfavorable to both mother and child. It is unreasonable to believe that an agreement entered into at the onset of a child's life can accurately anticipate and provide for all the contingencies that child will face until reaching adulthood. Thus, § 3 worked against and failed to be substantially related to the state's interest in procuring adequate child support for illegitimate children, and, accordingly, violated the right of illegitimate children to equal protection under the law.

Chief Justice WEAVER, dissenting, stated that MCL 722.713; MSA 25.493 creates a classification based on illegitimacy that cannot withstand heightened scrutiny.

MCL 722.713; MSA 25.493 affects only the right of illegitimate children, precluding them from obtaining additional support to meet changing needs where the parties have reached a settlement agreement pursuant to the statute. By contrast, there are no circumstances under which a legitimate child would be foreclosed from petitioning for future modification of child support. Therefore, the statute classifies children on the basis of illegitimacy and not on the basis of whether paternity has been legally determined.

Classifications based on illegitimacy are subject to heightened scrutiny. To withstand heightened scrutiny, the classification must be substantially related to an important governmental objective. Contrary to the majority's conclusion, MCL 722.713; MSA 25.493 is not substantially related to the governmental interest of providing financial support for children. The problems in proving the paternity of legitimate children and illegitimate children in claims for child support do not provide a justification that is sufficiently weighty or substantially related to the limitation to uphold MCL 722.713; MSA 25.493 under equal protection. Nor are the state's interests in settlement and finality sufficient to justify a classification based on illegitimacy.

Rather than operate as an additional mechanism for support, the statute imposes a burden on illegitimate children by restricting their ability to obtain adequate support. The possibility that children may encounter circumstances that alter their need for support does not vary between illegitimate and legitimate children. Both may encounter circumstances that give rise to a need for increased support. Yet, in the case of illegitimate children, they may be deprived of the opportunity to seek increased support on the basis of changed circumstances because their parents entered an agreement, pursuant to the statute, that precludes modification.

*Robés & Kobliska, P.C.* (by *Mathew Kobliska*), for plaintiff-appellee.

*Steven M. Jentzen* for defendant-appellant.

Markman, J. In this case, we are asked to consider the constitutionality of a repealed section of the Paternity Act, MCL 722.713; MSA 25.493,[1] which permitted a mother of a child born out of wedlock to enter into a nonmodifiable child support agreement with her child's putative father. We conclude that the statute in question did not violate equal protection guarantees.

### I. FACTUAL AND PROCEDURAL HISTORY

In October 1978, plaintiff filed a paternity action, alleging that defendant fathered plaintiff's daughter who was born in August 1978. In 1980, the parties reached a settlement agreement, and the complaint was dismissed without having determined the issue of paternity. Through the settlement agreement, defendant agreed to pay weekly child support but did not acknowledge paternity. As required by MCL 722.713; MSA 25.493, the trial court approved the terms of the settlement and ordered defendant to pay child support of $20 a week, pending a formal recommendation from the friend of the court. A second order was later entered, increasing the support to $35 a week, and providing that the order was "not modifiable." Moreover, this second order provided that the matter "shall stand settled, discontinued, and dismissed" as

---

[1] The Legislature repealed the statute effective June 1, 1997, after a Court of Appeals decision finding the statute unconstitutional. *Dones v Thomas*, 210 Mich App 674; 534 NW2d 221 (1995).

to defendant. In January 1981, after receiving the friend of the court's support recommendation, the trial court entered a "permanent" order, requiring defendant to pay $50 a week until the child's eighteenth birthday or until further order of the court.[2]

In the early 1990s, plaintiff filed a motion to modify the support order, but the trial court dismissed the motion on the ground of res judicata. A divided panel of the Court of Appeals affirmed the dismissal, holding that the nonmodifiable settlement agreement was binding on the parties. 201 Mich App 443, 447; 506 NW2d 568 (1993) (*Crego I*). Additionally, the Court rejected plaintiff's claim that MCL 722.713; MSA 25.493 was an unconstitutional denial of equal protection to illegitimate children. *Id.* at 446, citing *Hisaw v Hayes*, 133 Mich App 639, 642; 350 NW2d 302 (1984).

In 1995, however, in an unrelated case, the Court of Appeals reached the opposite conclusion when it held that MCL 722.713; MSA 25.493 violated the constitutional guarantees of equal protection because the statute authorized nonmodifiable child support awards in paternity actions, while child support awards in divorce actions always remain modifiable. *Dones v Thomas*, 210 Mich App 674; 534 NW2d 221 (1995). The Court did not make reference to its earlier decision in *Crego I*. In response to *Dones*, plaintiff renewed her motion for modification of child support, and the trial court granted the motion, concluding that it was required to follow the decision in *Dones*, even where that decision conflicted with *Crego I*. The trial court also held that the parties would be

---

[2] This order was not signed by the parties, nor did their attorneys approve the order as to form or substance. We express no opinion regarding the effect of this circumstance.

afforded an opportunity to resolve any issue regarding paternity through the use of DNA testing if they so desired.

On appeal, the Court of Appeals held that it would find the statute unconstitutional except that it was barred from doing so by MCR 7.215(H)(1), requiring the Court to follow *Crego I*, regardless of the *Dones* decision. 226 Mich App 815, 821 (1997) (*Crego II*). A conflict panel was convened to resolve the conflict between *Crego I* and *Crego II*, MCR 7.215(H)(3),[3] and that panel held that MCL 722.713; MSA 25.493 was unconstitutional as a violation of the equal protection guarantees of the United States and Michigan Constitutions. 232 Mich App 284; 591 NW2d 277 (1998) (*Crego III*). We granted leave to appeal. 461 Mich 896 (1999).

## II. CONFLICTING STATUTORY CHILD SUPPORT PROVISIONS

The repealed section of the Paternity Act at issue here established a means of enforcing nonmodifiable child support agreements under certain circumstances:

> (a) An agreement or compromise made by the mother or child or by some authorized person on their behalf with the father concerning the support and education of the child shall be binding upon the mother and the child only when the court having jurisdiction to compel support and education of the child shall have determined that adequate provi-

---

[3] MCR 7.215(H)(1) requires that, "A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule."

sion is reasonably secured by payment or otherwise and
has approved the agreement or compromise.

(b) The performance of the agreement or compromise,
when so approved, *shall bar other remedies of the mother
or child for the support and education of the child.* [MCL
722.713; MSA 25.493 (emphasis added).]

It is important to recognize that the challenged stat-
ute was only relevant to nonmodifiable agreements
where all the following elements were present: (1) a
paternity action was filed; (2) the child's mother and
putative father[4] voluntarily entered into an agreement
regarding child support, *in lieu of* a judicial determi-
nation of paternity; (3) the circuit court made a deter-
mination that the agreement secured "adequate provi-
sion" for the child's needs; and (4) the agreement
failed to include language preserving the right to
modify support levels at a later time.

In the instant case, the parties expressly agreed to
nonmodifiable support. Specifically, the stipulation
provided that, "it is the intent of the parties that the
attached order is not modifiable," and further pro-
vided that, "this matter shall stand settled, discontin-
ued, and dismissed" against defendant.

Plaintiff bases her constitutional challenge on the
interplay between several statutes providing mecha-
nisms for obtaining child support. Child support may
be established through one of three categories of sup-

---

[4] Although the statute referred to an agreement reached with "the
father" concerning child support, that language should be read to mean
"putative father." The disputed provision only applied when a paternity
suit had been filed, but a paternity determination had not yet been made.
Common sense requires us to read this language to mean the "putative
father," as no determination of paternity has been made when a paternity
complaint is initially filed. Additionally, the statute appears to use the
term "putative father" interchangeably with "father."

port orders: (1) those entered pursuant to a divorce action; (2) those entered pursuant to a paternity action in which paternity has been established (through one of a number of available methods); and (3) those, as here, entered pursuant to a stipulation to dismiss a paternity action before determining paternity.

In the first category, children born or conceived during a marriage are deemed issue of the marriage,[5] and child support agreements entered in divorce actions always remain modifiable, depending upon changed circumstances. This is made clear through the text of three separate statutory provisions. MCL 552.455(1); MSA 25.222(5)(1) explains the process through which predivorce temporary support orders may be modified; MCL 552.17(1); MSA 25.97(1) explains the process through which support orders entered pursuant to divorce may be modified by motion of the parties; and MCL 552.517; MSA 25.176(17) provides that postjudgment modifications to support orders may be made pursuant to friend of the court recommendations. These provisions, considered together, allow a circuit court to modify all child support agreements reached pursuant to a divorce action.

In the second category, child support orders remain modifiable where a final paternity determination has been reached by way of a formal paternity action. Such a determination may be made through a variety of methods. In the first of two statutory methods, the Paternity Act, MCL 722.711 *et seq.*; MSA 25.491 *et seq.*,

---

[5] This presumption is rebuttable. The Paternity Act is applicable where the presumption has been successfully rebutted.

allows modification in cases where an order of filiation has entered:

> The court has continuing jurisdiction over proceedings brought under this act to increase or decrease the amount fixed by the order of filiation subject to section 7(3) or (4), and to provide for, change, and enforce provisions of the order relating to the custody or support of or parenting time with the child. [MCL 722.720(1); MSA 25.500(1).]

The second statutory category, also found in the Paternity Act, MCL 722.711 *et seq.*; MSA 25.491 *et seq.*, allows modification in cases where an acknowledgment of paternity has been obtained:

> An acknowledgment signed under this act establishes paternity, and the acknowledgment may be the basis for court ordered child support, custody, or parenting time without further adjudication under the paternity act . . . . The child who is the subject of the acknowledgment shall bear the same relationship to the mother and the man signing as the father as a child born or conceived during a marriage and shall have the identical status, rights, and duties of a child born in lawful wedlock effective from birth. [MCL 722.1004; MSA 25.604.]

> Except as otherwise provided by law, a mother and father who sign an acknowledgment that is filed as prescribed in section 5 are consenting to the general, personal jurisdiction of the courts of record of this state regarding the issues of the support, custody, and parenting time of the child. [MCL 722.1010; MSA 25.610.]

It is the third statutory category of establishing child support—through orders entered pursuant to a voluntary stipulation to dismiss a paternity action before determining paternity—that is at issue in the instant case. Only in this statutory category are non-modifiable support agreements permitted. It is impor-

tant to note, however, that this third category of child support includes both modifiable and nonmodifiable support agreements. The statute does not *require* that such orders be nonmodifiable; it merely *permits* nonmodifiable orders, provided that the court determines that the parties' agreement adequately provides for the child.

### III. EQUAL PROTECTION CLAUSE

The Equal Protection Clauses of the United States Constitution and the Michigan Constitution provide that no person shall be denied the equal protection of the law. US Const, Am XIV;  Const 1963, art 1, § 2. This Court has found Michigan's equal protection provision coextensive with the Equal Protection Clause of the federal constitution. See, e.g., *Frame v Nehls*, 452 Mich 171, 183; 550 NW2d 739 (1996) ("[t]he Michigan and federal Equal Protection Clauses offer similar protection"); *Doe v Dep't of Social Services*, 439 Mich 650, 670-671; 487 NW2d 166 (1992) ("a review of the jurisprudence and constitutional history of this state suggests . . . that our Equal Protection Clause was intended to duplicate the federal clause and to offer similar protection").

The essence of the Equal Protection Clauses is that the government not treat persons differently on account of certain, largely innate, characteristics that do not justify disparate treatment. *Miller v Johnson*, 515 US 900, 919; 115 S Ct 2475; 132 L Ed 2d 762 (1995); *El Souri v Dep't of Social Services*, 429 Mich 203, 207; 414 NW2d 679 (1987). Conversely, the Equal Protection Clauses do not prohibit disparate treatment with respect to individuals on account of other, presumably more genuinely differentiating, character-

istics. *Puget Sound Power & Light Co v City of Seattle*, 291 US 619; 54 S Ct 542; 78 L Ed 1025 (1934). Moreover, even where the Equal Protection Clauses are implicated, they do not go so far as to prohibit the state from distinguishing between persons, but merely require that "the distinctions that are made not be arbitrary or invidious." *Avery v Midland Co, Texas*, 390 US 474, 484; 88 S Ct 1114; 20 L Ed 2d 45 (1968).

When a party raises a viable equal protection challenge, the court is required to apply one of three traditional levels of review, depending on the nature of the alleged classification. The highest level of review, or "strict scrutiny," is invoked where the law results in classifications based on "suspect" factors such as race, national origin, or ethnicity, none of which are implicated in this case. *Plyler v Doe*, 457 US 202, 216-217; 102 S Ct 2382; 72 L Ed 2d 786 (1982). Absent the implication of these highly suspect categories, an equal protection challenge requires either rational-basis review or an intermediate, "heightened scrutiny" review.

### A. WHERE RATIONAL BASIS APPLIES

Under rational-basis review, courts will uphold legislation as long as that legislation is rationally related to a legitimate government purpose. *Dandridge v Williams*, 397 US 471, 485; 90 S Ct 1153; 25 L Ed 2d 491 (1970). To prevail under this highly deferential standard of review, a challenger must show that the legislation is "arbitrary and wholly unrelated in a rational way to the objective of the statute." *Smith v Employment Security Comm*, 410 Mich 231, 271; 301 NW2d 285 (1981). A classification reviewed on this basis passes constitutional muster if the legislative judg-

ment is supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable. *Shavers v Attorney General*, 402 Mich 554, 613-614; 267 NW2d 72 (1978). Rational-basis review does not test the wisdom, need, or appropriateness of the legislation, or whether the classification is made with "mathematical nicety," or even whether it results in some inequity when put into practice. *O'Donnell v State Farm Mut Automobile Ins Co*, 404 Mich 524, 542; 273 NW2d 829 (1979). Rather, the statute is presumed constitutional, and the party challenging it bears a heavy burden of rebutting that presumption. *Shavers, supra.*

### B. WHERE HEIGHTENED SCRUTINY APPLIES

The United States Supreme Court has recognized an intermediate level of review, between strict-scrutiny and rational-basis review, under which a challenged statutory classification will be upheld only if it is "substantially related to an important governmental objective." *Clark v Jeter*, 486 US 456, 461; 108 S Ct 1910; 100 L Ed 2d 465 (1988). This "heightened scrutiny" standard has been applied to legislation creating classifications on such bases as illegitimacy and gender. The standard recognizes that, while there may be certain immutable distinctions, for example, between men and women or between legitimate and illegitimate children, that justify differing legislative treatments under some circumstances, the Legislature's authority to invoke those distinctions should not be viewed as an "impenetrable barrier that works to shield otherwise invidious discrimination." *Gomez v Perez*, 409 US 535, 538; 93 S Ct 872; 35 L Ed 2d 56 (1973). See also, e.g., *Clark, supra; Mills v Hab-*

*luetzel,* 456 US 91; 102 S Ct 1549; 71 L Ed 2d 770 (1982); *Mathews v Lucas,* 427 US 495, 505-506; 96 S Ct 2755; 49 L Ed 2d 651 (1976) (all applying heightened scrutiny to classifications based on illegitimacy). Thus, where an equal protection claim alleges unconstitutional treatment on the basis of illegitimacy, the Supreme Court has held that "a State may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally." *Gomez, supra* at 538. However, where a challenged statute is substantially related to an important state interest, the statute should be upheld. *Mills, supra* at 98-99.

### IV. PROBLEMS IN CHARACTERIZATION

#### A. GENERAL PROBLEMS IN CHARACTERIZATION

Whether the Court uses a rational-basis or heightened scrutiny standard of review depends on the characterization of the statutorily created classifications. See, e.g., *Mathews, supra* at 504. Legislation, by its intrinsic nature, creates classifications, typically resulting in benefits or detriments to defined classes. See, e.g., *Personnel Administrator of Massachusetts v Feeney,* 442 US 256, 271-272; 99 S Ct 2282; 60 L Ed 2d 870 (1979); *F S Royster Guano Co v Virginia,* 253 US 412, 415; 40 S Ct 560; 64 L Ed 989 (1920). It may sometimes be difficult, at least outside the realm of "strict scrutiny" review, to define a law in terms of whether it is countenancing a constitutionally impermissible classification or merely classifying persons who are genuinely situated differently.

This is because, in one sense, an equal protection claim simultaneously asserts that two persons are similarly situated, but also that, at another level, such

persons are *not* similarly situated. The assertion that
the two *are* similarly situated forms the predicate for
the argument that, notwithstanding such similarity,
they are being treated in a differing manner in some
regard. The assertion that the two are *not* similarly
situated is a function of the fact that there is some
unshared characteristic that allegedly forms the basis
for the differing treatment. Consequently, because an
equal protection claim sometimes implicates this ten-
sion between the assertions of similarity and dissimi-
larity, its success may sometimes rise or fall on the
basis of a court's characterization of the classifica-
tions created by a particular statute.[6]

## B. SPECIFIC PROBLEMS IN CHARACTERIZATION

Not surprisingly, defendant characterizes this case
as one in which different treatment has been properly
afforded to children who were not, in fact, similarly
situated. Rather, children whose paternity *had* been
ascertained were treated differently than children
whose paternity had *not* been ascertained. This is not
an unreasonable characterization. The only children
affected by the statute were those: (1) whose putative

---

[6] In *Feeney, supra,* for example, the Supreme Court faced the difficul-
ties in the characterization of a statute when female plaintiffs challenged
a law granting veterans preferences with regard to state civil service hir-
ing decisions. 442 US 259. Because the law operated overwhelmingly to
the advantage of male applicants, the plaintiffs characterized the prefer-
ence as impermissibly creating a classification on the basis of gender.
However, the Court ultimately chose to characterize the preference as one
creating a classification on the basis of one's status as a veteran. In other
words, the Court determined that, even though significantly more men
than women were being granted a benefit by the preference, the law was
properly characterized as one granting veterans, regardless of gender, a
benefit over nonveterans. Rather than distinguishing between persons on
the basis of gender, the law distinguished between job applicants on the
basis of nongender considerations.

father had not admitted paternity by signing an acknowledgment; (2) whose putative father had not been adjudicated the natural father through an order of filiation; and (3) whose mother had not been able to obtain, through stipulation, a modifiable support agreement.

The constitutional challenge here, from defendant's perspective, is not unlike that raised in *Frame v Nehls, supra.* In *Frame,* a grandfather sought visitation rights with his illegitimate grandchild. Under the relevant statute, grandparents only had standing to seek visitation during the pendency of a "child custody dispute." Because a paternity action was not within the statutory definition of a "child custody dispute," the grandfather lacked standing, and he challenged the statute on equal protection grounds, claiming that it unconstitutionally differentiated between legitimate and illegitimate children.

As in the instant case, the Court of Appeals in *Frame* agreed that the challenged statute created classifications on the basis of illegitimacy, and it found the statute an unconstitutional denial of equal protection. *Frame v Nehls,* 208 Mich App 412, 416; 528 NW2d 773 (1995). However, this Court disagreed, holding that the classification did not distinguish between children on the basis of illegitimacy. Rather, this Court pointed out that grandparents had standing to pursue visitation regardless of the child's legitimacy where, for example, the parents of a child born out of wedlock married, then later divorced. Consequently, this Court concluded that the statute did not create classifications on the basis of illegitimacy. 452 Mich 186-187.

Under this statute, there are a variety of situations under which illegitimate children receive the same right to fully modifiable support as children born during a marriage. First, where a putative father has signed an acknowledgment of paternity, any child support order entered regarding the child is fully modifiable, because that child was, and is, accorded the "identical status, rights, and duties of a child born in lawful wedlock." MCL 722.1004; MSA 25.604. Second, where a putative father has been adjudicated the natural father by a circuit court, and an order of filiation has been entered, any child support order entered regarding that child was, and is, modifiable under MCL 722.720; MSA 25.500. Finally, where the parties to a paternity action have reached an agreement regarding child support, that agreement is modifiable as long as the support order includes language allowing modification. Consequently, it is not unreasonable to conclude that the statute has not created a classification on the basis of illegitimacy, but rather has created a classification on the basis of whether *paternity had been legally determined.* This is a classification that distinguishes between categories of illegitimate children, not between the categories of illegitimate and legitimate children. Under this interpretation, the statute should be upheld as long as it is rationally related to a permissible legislative objective.[7] See *Dandridge, supra* at 485; *Manistee Bank &*

---

[7] A classification based on whether paternity has been determined neither implicates a fundamental right or an inherently suspect class, nor has it been recognized by this Court or the United States Supreme Court as deserving of any heightened standard of review. Moreover, the parties have provided no reason we should now create a new category of suspect class.

*Trust v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975).

The dissent concludes that "[i]t is unreasonable to find that the statute did anything except distinguish the treatment of children on the basis of legitimacy." *Post* at 284 (KELLY, J., dissenting); see also *post* at 293-294 (WEAVER, C.J., dissenting). The dissenting justices reach this conclusion because, "illegitimate children, and they alone, received disparate treatment." *Post* at 284 (KELLY, J., dissenting); see also *post* at 294 (WEAVER, C.J., dissenting). However, the facts in the instant case are not unlike the facts in *Geduldig v Aiello,* for example, where women, and they alone, were denied certain disability insurance benefits because the policy excluded benefits for pregnancy. 417 US 484; 94 S Ct 2485; 41 L Ed 2d 256 (1974).[8] In response to the argument that the challenged provision discriminated on the basis of gender because it *only* affected women—an argument analogous to the dissents' conclusion in the instant case—the Court stated:

> While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . . The [insurance] program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes. [*Id.* at 496, n 20.]

---

[8] Superseded by statute as noted in *Newport News Shipbuilding & Dry Dock Co v EEOC,* 462 US 669, 678; 103 S Ct 2622; 77 L Ed 2d 89 (1983).

Likewise, "[w]hile it is true" that only illegitimate children face the risk of being unable to determine paternity with legal certainty, "it does not follow that every legislative classification concerning" the determination of paternity is an illegitimacy-based classification. Rather, in each case, the fundamental classification may be more appropriately identified as distinguishing between subclassifications of the larger group—only women who are pregnant, and only illegitimate children who have not determined paternity.[9]

Plaintiff, like the dissents, and also not surprisingly, characterizes the challenged statute as one creating a statutory classification on the basis of illegitimacy. And although we could reasonably conclude that the statute merely differentiated on the basis of whether paternity had been ascertained, we also acknowledge that plaintiff's characterization of the statute is not unreasonable. First and foremost is our acknowledgment that the statute, where it applies, *only* affects illegitimate children. There is no apparent set of circumstances under which a legitimate child would be the object of an enforceable, nonmodifiable support agreement.[10] And while we do not find this dispositive regarding the "correct" characterization of the statute,

---

[9] We emphasize again that we do not necessarily disagree with the dissents that the statute may also *reasonably* be characterized as one that creates classifications on the basis of illegitimacy. Rather, we merely acknowledge that, just as it is not unreasonable to characterize a statute relating to pregnancy in more than one manner, it is not unreasonable to characterize the statute here in more than one manner. Because we find that the statute, as applied, was constitutional under *either* characterization, we need not decide which of these characterizations is more appropriate.

[10] The Paternity Act applies to children born during wedlock who are later deemed not to be the issue of the marriage. Thus, these children would be classified also as "illegitimate." MCL 722.713; MSA 25.493.

see *Geduldig, supra,* it certainly provides support for a reasonable conclusion that the statute does create illegitimacy-based classifications.

We find it noteworthy that the Paternity Act itself, on its face, unquestionably differentiates between illegitimate and legitimate children. Indeed, it is an act created solely to apply to illegitimate children, to afford those children an opportunity to obtain child support that has always been available to legitimate children. Yet, surely plaintiff would not argue that the act itself is violative of equal protection merely because it recognizes the unique circumstances of the illegitimate child. But for this act, illegitimate children had no clearly enforceable means of obtaining support from their fathers. The individual provision in controversy is merely one specific element of the act, and that provision, like the overall act itself, advances the underlying goal of providing support to children who might otherwise be left without that support.

The United States Supreme Court has repeatedly examined laws differentiating on the basis of illegitimacy. For example, in *Mills* and *Clark, supra,* the Court examined Texas and Pennsylvania laws limiting the period during which illegitimate children could establish paternity. The Texas statute required that paternity actions be filed within one year after the illegitimate child's birth, and the Pennsylvania statute required that paternity actions be filed within six years after the illegitimate child's birth. As in the instant case, the challenged statutes affected only illegitimate children. However, also similar to the instant case, the challenged Texas and Pennsylvania statutes ultimately only affected a subclassification of illegitimate children—those who failed to establish pater-

nity within the statutory period of limitations.[11] See
also *Lalli v Lalli*, 439 US 259; 99 S Ct 518; 58 L Ed 2d
503 (1978) (upholding a New York statute imposing a
proof requirement on illegitimate children who would
inherit from their fathers); *Trimble v Gordon*, 430 US
762; 97 S Ct 1459; 52 L Ed 2d 31 (1977) (striking down

---

[11] Neither *Mills* nor *Clark* requires us to reach the conclusion that the
statute challenged here created classifications on the basis of illegitimacy;
in neither of those cases did the Court address the threshold question
whether the challenged statutes actually created classifications on the
basis of legitimacy. The dissent states, "I conclude that the [*Clark*] Court
did find that the statute created a classification on the basis of illegiti-
macy." *Post* at 285-286, n 4 (KELLY, J., dissenting). However, Justice KELLY
reaches this conclusion, not because the Court expressly decided that the
statute created classifications on the basis of illegitimacy, but rather
because the Court examined the statute under intermediate scrutiny. We
find the dissenter's analysis flawed. In both *Mills* and *Clark*, the Supreme
Court was examining statutory periods of limitation applicable to *all* ille-
gitimate children. Unlike the statute before us, the statutes challenged in
*Mills* and *Clark* imposed a requirement on *all* illegitimate children—either
ascertain paternity within the allotted time frame or be forever precluded
from access to child support. So even though we conclude, for argument's
sake, that the statutes in *Mills* and *Clark*, *as applied,* could be character-
ized as creating classifications either on the basis of illegitimacy or on the
basis of whether paternity had been determined, there are significant dif-
ferences between those cases and the instant case that could lead the
same court to opposite results. Specifically, the statutes challenged in
*Mills* and *Clark* created a mandatory prerequisite to child support for *all*
illegitimate children—prove paternity within the period of limitation. By
contrast, the instant statute created options—prove paternity, obtain a
nonmodifiable support agreement, or even obtain a modifiable support
agreement. Consequently, even if we were to agree that the Supreme
Court reached a decision that it did not expressly address, and even if we
were to agree that such implicit decision making was binding on this
Court, *Mills* and *Clark* do not require a conclusion that the challenged
statute creates an illegitimacy-based classification; those cases are readily
distinguishable from the instant case on their facts.

Even more importantly, the *Clark* Court was careful to point out that
statutory classifications based on illegitimacy designed to punish the con-
duct of parents were different than statutory classifications based on ille-
gitimacy designed to address paternity proof problems in the support con-
text. *Clark, supra* at 461. The disputed statute here, to the extent that it
treated illegitimate children differently than legitimate children, addressed
the latter issue. That is, the challenged statute provided an alternative
means of obtaining support for a child where paternity was uncertain.

as unconstitutional an Illinois statute allowing legitimate children to inherit from both parents but precluding illegitimate children from inheriting from their fathers).

### V. RESOLVING THE PRESENT CASE

#### A. RATIONAL BASIS SATISFIED

The plaintiff does not claim that the statute in question is unconstitutional on its face. Consequently, the claim must fail unless the statute's *application* renders it unconstitutional. When faced with a claim that application of a statute renders it unconstitutional, the Court must analyze the statute "as applied" to the particular case. See, e.g., *People v Lino*, 447 Mich 567, 570-571; 527 NW2d 434 (1994). Regardless of the level of scrutiny employed, an equal protection challenge requires us to make two findings: the governmental purpose behind the legislative enactment, and how closely related the law is to that purpose. If we view the challenged statute as one that merely differentiates on the basis of whether paternity has been established, we must then determine whether the statute is rationally related to a legitimate state interest. See *Dandridge*, *supra* at 485.

The underlying purpose of the Paternity Act is to ensure that minor children born outside a marriage are provided with support and education. *Whybra v Gustafson*, 365 Mich 396, 400; 112 NW2d 503 (1961). It is beyond dispute that this is a permissible government purpose. Thus, under rational-basis review, the statute should be upheld unless allowing nonmodifiable support agreements where paternity has not been ascertained is "arbitrary and wholly unrelated in a rational way to the objective of" securing support

for children. *Smith v Employment Security Comm*, *supra* at 271.

In the context of a law created to secure child support from fathers, there is a core distinction between knowing who the child's father is and not knowing who the child's father is. Absent the disputed law, children whose paternity could not be determined had no means of obtaining support from their fathers. MCL 722.713; MSA 25.493 directly addressed the proof problem present in child support cases involving illegitimate children by providing an *additional* method by which illegitimate children could obtain financial support, again, a permissible, and even compelling government interest. See *Clark*, *supra* at 461.

As a result of DNA testing, the accuracy with which paternity can be proven has increased significantly since the parties in this lawsuit entered into their support agreement. See Shapiro, Reifler & Psome, *The DNA paternity test: Legislating the future paternity action*, 7 J Law & Health 1, 29 (1992-93) (current testing methods can determine the probability of paternity to 99.999999% accuracy). However, at the time the parties before us entered into the disputed agreement, proving paternity was a very significant obstacle to an illegitimate child's access to child support. The first reported results of modern DNA paternity testing did not occur until 1985. See Blakesley, *Scientific testing and proof of paternity: Some controversy and key issues for family law counsel*, 57 La L R 379, 382 (1997) ("In fact, since its first reported results in 1985, DNA matching has progressed to 'general acceptance in less than a decade' "). Of course, while prior blood-testing methods could exclude some males from being the possible father of a child,

those methods could not affirmatively pinpoint a particular male as being the father. Thus, when the settlement agreement between the present parties was entered in 1980, establishing paternity was a far more difficult ordeal than at present. Contested paternity actions at that time were often no more than credibility contests. See Illinois Family Study Commission, Report and Recommendations to the 76th General Assembly (1969) at 55 (finding that paternity actions at the time were often rife with coercion, corruption and perjury). Consequently, in every contested paternity action, obtaining child support depended not merely on whether the putative father was, in fact, the child's biological father, but rather on whether the mother could prove to a court of law that she was only sexually involved with one man—the putative father. Allowing parties the option of entering into private agreements in lieu of proving paternity eliminated the risk that the mother would be unable to meet her burden of proof. The procedure established by the Paternity Act provided a voluntary and additional alternative to the often uncertain paternity suit process by which a mother could obtain support for her illegitimate child.

In light of the pre-DNA proof problems associated with proving paternity, the availability of nonmodifiable child support specified by the Paternity Act promotes the principal purpose of the act, i.e., to ensure that minor children born outside a marriage are provided with support and education. *Whybra, supra.* The statute in question takes cognizance of perhaps the central distinction between illegitimate and legitimate children—the formers' reduced lack of certainty regarding their paternity. By recognizing this reality,

and seeking to ameliorate its consequences, the statute, as applied, is rationally related to the state's interest in ensuring that illegitimate children are provided support. For these reasons, we conclude that the disputed statute satisfies a rational-basis standard of review.[12]

### B. HEIGHTENED SCRUTINY SATISFIED

In *Gomez, supra* at 538, the United States Supreme Court acknowledged that treating illegitimate children differently might be appropriate under some circumstances, due to the "lurking problems with respect to proof of paternity." See also *Clark, supra* at 461. The very existence of an "intermediate" level of review, i.e., a standard of review more respectful of legislative distinctions than with regard to the most highly suspect categories of race, nationality, and ethnicity, represents an implicit acknowledgment that there are some immutable distinctions between various classes of persons, and that it is sometimes within the Legislature's prerogative to address those distinctions,

---

[12] Even recognizing that DNA testing can conclusively establish paternity, and that the unreliability of testing is no longer the obstacle that it once was in paternity suits, this does not altogether eliminate "proof" problems in the context of paternity suits. Proving paternity involves not only the technical and scientific elements of establishing a genetic relationship, but also a variety of other legal and practical burdens, including the necessity of identifying and locating the putative father, the need to obtain and enforce court orders requiring paternity testing, the emotional and psychological burdens associated with trial, the inevitable uncertainties of the legal process, and, while perhaps increasingly remote, problems associated with obtaining reliable test results. Each of these steps to proving paternity can involve significant resources, in terms of time, effort, and money. Moreover, there may conceivably be circumstances in which ascertaining paternity through the legal process may not always be in the child's own best interest, even where such paternity could be proven conclusively from a scientific standpoint.

even where the result is dissimilarity of treatment. For example, legislation addressing some aspect of pregnancy and childbirth does not violate equal protection merely because it differentiates on the basis of gender. *Geduldig, supra* at 496, n 20. Rather, such legislation would be in direct response to an immutable difference between men and women—the biological ability to bear children. See also *Rostker v Goldberg*, 453 US 57; 101 S Ct 2646; 69 L Ed 2d 478 (1981) (holding that women were not similarly situated to men for purposes of a draft or registration for a draft).

Providing financial support for children is a permissible, important, and even compelling governmental interest. A core distinction between legitimate and illegitimate children is the difficulty of determining paternity of the latter with the same level of certainty that paternity can be ascertained with respect to the former. And where paternity is uncertain—again, one of the immutable distinctions between legitimate and illegitimate children—providing an alternative means of obtaining child support to mothers who may not otherwise be able to prove paternity is substantially related to the goal of providing children with support. This is particularly true with respect to the instant case, where the parties entered into their agreement at a time in which plaintiff faced significant obstacles to overcoming defendant's claim that he was not the child's father. The lack of modern DNA testing when these parties entered their settlement underscores that the statute, as applied in this case, did not violate the constitutional guarantees of equal protection. See, e.g., *Lino, supra* at 570-571.

The possibility of nonmodifiable child support held out by MCL 722.713; MSA 25.493 provided an incentive for a putative father of an illegitimate child not to dispute paternity. This furthered the important governmental objective of ensuring financial support for children who otherwise may have gone without any form of "paternal" child support.[13]

The dissents rely on *Gerhardt v Estate of Moore,* 150 Wis 2d 563; 441 NW2d 734 (1989), as support for the conclusion that the disputed statute was unconstitutional under intermediate scrutiny. *Post* at 288 (KELLY, J., dissenting); *post* at 295 (WEAVER, C.J., dissenting). However, as the dissent in *Gerhardt* notes, there is an important distinction between the facts in *Clark, supra,* and the facts in *Gerhardt*:

> Where the statute of limitations in *Clark*, according to the Supreme Court, might prevent a mother from bringing a support claim on behalf of the nonmarital child because she might not act to protect the child's interest in a timely manner, the settlement provision of the Wisconsin Statutes at

---

[13] Justice KELLY compares the instant case to *Evink v Evink*, 214 Mich App 172; 542 NW2d 328 (1995), a case in which the Court of Appeals obviated a father's attempt to avoid his child-support obligations through voluntary termination of his parental rights. However, this case illustrates precisely why it may be appropriate in some cases to treat legitimate and illegitimate children differently. A child's absolute right to receive child support from a father only has value where paternity can, in fact, be ascertained. A child does not have an absolute right to receive child support from a *putative* father. The case before us is not a case in which a known parent has been allowed to "voluntarily release parental rights in order to escape the child support obligation . . . ." *Id.* at 176. Rather, this is a case in which a child of *uncertain* paternity was provided with a means of obtaining child support from a person who, because of evidentiary limitations, might otherwise have avoided any obligation to pay child support. An analogy between *Evink* and the instant case fails for the same reason that the challenged statute is constitutional—unavoidably there are immutable differences between legitimate and illegitimate children. Ascertaining paternity with certainty is such a difference.

issue in this case encourages her to do so. [*Id.* at 578 (Callow, J., dissenting).]

Likewise, MCL 722.713; MSA 25.493 did not operate to "prevent a mother from bringing a support claim on behalf of [her] nonmarital child." Rather, it operated as an *incentive* to those mothers who might have otherwise been reluctant or unable to invoke the paternity process in the face of highly uncertain prospects. Thus, the Wisconsin statute, and the statute before us, operated, not as a burden, as suggested by Justice KELLY, *post* at 287, n 5 (KELLY, J., dissenting), but as a benefit.

Even presuming, however, that *Gerhardt* was correctly decided, that case is clearly distinguishable on its facts. First, the statute challenged in Wisconsin allowed nonmodifiable settlement agreements in *all* paternity actions, regardless of whether paternity had been admitted or ascertained by the court.[14] Contrary to Justice KELLY's conclusion, this is a distinction with a crucial difference. See *post* at 291, n 10 (KELLY, J., dissenting). MCL 722.713; MSA 25.493, allows nonmodifiable support agreements only where paternity has *not* been ascertained, a distinction illustrating the

---

[14] "If the defendant is found the father of the child, or admits the truth of the allegation, or enters into a settlement agreement, he shall be adjudged to be the father of such child, unless paternity is denied in such settlement agreement, . . . ." *Madison General Hosp v Haack*, 124 Wis 2d 398, 410, n 7; 369 NW2d 663 (1985), quoting St 1975, § 52.37(1). See also *Larson v Wisconsin Dep't of Industry, Labor & Human Relations*, 76 Wis 2d 595, 618-619; 252 NW2d 33 (1977).

St 1967, § 52.38 provided for modification of settlement agreements entered pursuant to St 1975, § 52.37 only if the father (or putative father) failed to comply with the terms of the settlement, or where the settlement agreement "providing for the monthly support of a child born out of wedlock has been docketed or filed . . . ." *Gerhardt, supra* at 573, quoting St 1967, § 52.38.

clear relationship between the Michigan statute and
paternity proof problems. Second, the defendant in
*Gerhardt* acknowledged paternity. *Id.* at 566. It is
true, as Justice KELLY observes, that the Wisconsin
Supreme Court did not consider the defendant's
admission of paternity in reaching its decision. *Post* at
291, n 10 (KELLY, J., dissenting). We point out, how-
ever, that in Michigan, once a putative father has
acknowledged paternity, his child is entitled to fully
modifiable support, just as any other child whose
paternity has been ascertained. MCL 722.1004; MSA
25.604. It is only where paternity is uncertain that
nonmodifiable child support is allowed.[15] Thus, if we

---

[15] Justice KELLY also cites *Dep't of Public Aid ex rel Cox v Miller*, 146 Ill
2d 399; 586 NE2d 1251 (1992), and suggests that the Illinois Supreme
Court, in order to "salvage" an otherwise unconstitutional statute similar
to the challenged statute here, interpreted a provision allowing illegiti-
mate children the continuing right to file an action to *ascertain paternity*
as also allowing those children to seek *modification* of nonmodifiable
support agreements. *Post* at 289, n 8 (KELLY, J., dissenting). Regardless of
the Illinois Supreme Court's dicta regarding what it would or would not
find constitutional under facts not before it, the challenged statutory
scheme in that case allowed an illegitimate child to file a paternity action
at any time. The Illinois court relied on the express language of the state's
Paternity Act to conclude that whenever paternity was ascertained, the
child was entitled to the same right to modifiable child support as legiti-
mate children. *Miller, supra* at 411, quoting Ill Rev Stat 1983, ch 40, par
1352, "The father of a child born out of wedlock whose paternity is estab-
lished in a proceeding under this Act shall be liable for its support . . . to
the same extent and in the same manner as the father of the child born in
lawful wedlock . . . ." Although the court expressed its opinion with
respect to the constitutionality of a hypothetical statute that precluded
modification, there is no indication in its opinion that it relied on anything
but the plain language of the statutory scheme and legislative intent to
determine that the statute allowed complete modification any time that
paternity was ascertained and that a nonmodifiable settlement agreement
did not bar a suit to ascertain paternity. *Id.* at 412 ("To find otherwise
would be to denigrate the clearly expressed intent of the legislature as
well as the public policy of the State"). The mere fact that an appellate
court had interpreted the statute differently does not mean that "the stat-
ute did not allow modification of child support agreements until the court
interpreted it to do so." *Post* at 290, n 8 (KELLY, J., dissenting). Rather, the

were faced with the same facts as those before the Wisconsin Supreme Court, we cannot say whether we would reach a different conclusion. Clearly, under Michigan law, a defendant similarly situated to the defendant in *Gerhardt*, that is, one who has made a legal acknowledgment of paternity, would be required to provide fully modifiable child support, and the case would not be before us—a distinction with a clear difference.

It is true that, in this case, MCL 722.713; MSA 25.493 was given continued application even after the advent of modern DNA testing.[16] However, at least in the context of a case in which the settlement agreement pertaining to support for an illegitimate child was entered before the advent of modern DNA testing, important governmental interests are clearly served by continuing to give force to the agreement even after the advent of such testing. The most obvious interest is allowing parties to an agreement to order their conduct in reliance upon such agreements, and maintaining the integrity of such agreements. In this and in countless similar cases, parties entered into nonmodifiable settlement agreements that were expressly approved by a circuit court judge. The putative fathers in such cases were, in effect, promised by a trial court judge that the level of child support imposed upon them would not be increased above the amount provided for in the settlement agreement.

Illinois court found that the Paternity Act, as written and as the legislature had intended, allowed modification of child support any time that paternity could be determined. Consequently, that court's determination of the constitutionality of a dissimilar statutory scheme is of little value.

[16] For purposes of the instant case, we need not decide whether MCL 722.713; MSA 25.493, had it not been repealed, would remain constitutional today under intermediate scrutiny.

To allow these understandings to be altered years later, even on the basis of technological advances, could only be expected to undermine confidence in the legitimacy and fairness of a legal system that promised these individuals one thing, but then later changed the rules of the game. Moreover, if we were to allow these promises to be avoided where technological advances could be utilized to *prove* paternity, we would also, in fairness, need to allow such promises to be avoided where technological advances could be utilized to *disprove* paternity.

It is critical to recognize that this is not a statute designed to impose *burdens* upon illegitimate children for the behavior of their parents, or even to discourage sexual relations outside the institution of marriage or otherwise influence societal norms. Rather, it is designed to address paternity proof problems in the support context—an important governmental interest, repeatedly sanctioned by the United States Supreme Court—in order to afford the mother of an illegitimate child the opportunity to bind the child's putative father to a support order, without a final determination of paternity, and thereby to afford enhanced opportunities for the support of illegitimate children. We do not conclude, as Justice KELLY contends, that these benefits "[outweigh] the substantial interest our state has in ensuring that our youngsters receive adequate support throughout childhood." *Post* at 291, n 10. Rather, we conclude that these benefits themselves directly address "the interest our state has in ensuring that our youngsters receive adequate support throughout childhood." They do so by providing additional opportunities to

obtain that support to children who might otherwise be denied any support whatsoever.

Nor can we altogether ignore the fact that the instant statute does not compel mothers to agree to nonmodifiable support. Rather than denying illegitimate children the right of support from their fathers, the statute provides illegitimate children, through their mothers, a voluntary and *additional* optional mechanism for obtaining support—a compromise in exchange for the significant risk that the mother would lose the case and the child would receive no support whatsoever. Nonmodifiable support agreements, along with modifiable support agreements, are *available*, not *required*, under the statute, and are only enforceable where the court has otherwise determined that the agreements provide sufficient support for the child. Again, this is not a case in which the state "posit[ed] a judicially enforceable right of children to support from their natural fathers," but denied that same right to illegitimate children. *Mills, supra* at 92, citing *Gomez, supra.*

The dissenting opinions conclude that the statute, rather than providing an additional opportunity for illegitimate children to obtain support, actually operates to their detriment because it precludes modification of child support. However, this conclusion not only fails to take into consideration the practical problems confronting the mother of the illegitimate child in proving paternity before the advent of DNA testing, but also fails to consider that modification of child support is based on more than merely the child's needs. In determining whether modification is warranted, the courts are required to take into consideration, not only the child's needs, but also the

father's financial circumstances. Although recipients of nonmodifiable support may be precluded from obtaining an increase in support, they are also precluded from suffering a reduction in support. Even more consequentially, of course, absent the statute, the recipients of nonmodifiable support are "precluded" from being denied support *altogether*, such as where the mother was unable to overcome problems in proving paternity that existed before DNA testing. Moreover, putative fathers who agreed to nonmodifiable support are precluded from taking advantage of advances in technology to disprove paternity, just as the mothers are to prove paternity.[17] Finally, we emphasize again that nonmodifiable support agreements are only enforceable when a court has determined that they satisfactorily provide for the child.

---

[17] Justice Kelly finds this statement unpersuasive because of the judiciary's underlying goal of "ascertaining the truth." While this is true, the Legislature, in its enactment of the law, also has other objectives, in particular ensuring that illegitimate children are supported. At the time the instant agreement was entered into, the judicial system was less able to ascertain the truth concerning matters of paternity than it might be today. The mothers who entered into the agreements provided for by MCL 722.713; MSA 25.493 accepted nonmodifiable support to avoid the risk of receiving no child support whatsoever, in the event of their inability to convince the court that the putative father was, in fact, the biological father. Moreover, they avoided the risk of receiving a reduction in child support in the event that the child's needs and the parties' financial situation warranted such reduction, and they also avoided the risk that the putative father could, with advances in technology, eliminate child support altogether. Similarly, the putative fathers agreed to nonmodifiable support to avoid the risk of the court determining—perhaps incorrectly, and certainly not with scientific certainty—that they were the biological fathers. The goal of ascertaining the truth is not compromised when parties, recognizing the strengths and weaknesses of the proofs available in their situation, agree to make concessions so that each might avoid unnecessary risks. Here, the Legislature has allowed, and the parties have agreed, that a given child should receive child support from the putative father even without *judicial* ascertainment of the truth particularly where, as here, the judiciary lacked the means by which to ascertain this with any genuine degree of certainty.

While the courts certainly cannot anticipate every need and every change in the child's circumstances, these agreements have presumably been analyzed in the light of their ability to adequately provide for the child *throughout childhood.*

Because the statute is substantially and directly related to the general goal of obtaining child support for illegitimate children, and because it is substantially and directly related to the state's legitimate concern regarding proof problems in the child support context, we find that it is not an unconstitutional denial of equal protection under the law, regardless of whether the rational basis or intermediate standards of review are employed.

## VI. CONCLUSION

There are alternative ways of characterizing the classifications created by the instant statutory provision. One reasonable characterization is that this statute distinguishes between children whose paternity has not been ascertained and children whose paternity has been ascertained. Alternatively, the classifications created by the challenged statute could reasonably be characterized as being based on illegitimacy because the statute *only* affects children born out of wedlock.

Viewing the challenged statute as one which merely differentiates on the basis of whether paternity has been ascertained, we find that the statute is rationally related to the legitimate state interest of ensuring that minor children born out of wedlock are provided with support and education. Moreover, viewing the challenged statute as one that distinguishes children on

the basis of illegitimacy, we find that the statute's purpose of providing support for illegitimate children is an important, and even compelling, state interest and that the challenged statute, as applied, substantially and directly advances this important interest by providing an avenue to avoid problems associated with proving paternity, yet still provide support for the child.

Therefore, we find that, regardless of this Court's characterization of the classifications created by the challenged statute, the statute does not violate the constitutional guarantees of equal protection of the law. We reverse the judgment of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

TAYLOR, CORRIGAN, and YOUNG, JJ., concurred with MARKMAN, J.

KELLY, J. (*dissenting*). The Paternity Act, before being amended, impermissibly discriminated against illegitimate children by denying them the opportunity accorded legitimate children for modification of agreements providing for their support.[1] "[A] State may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally." *Gomez v Perez*, 409 US 535, 538; 93 S Ct 872; 35 L Ed 2d 56 (1973). Therefore, I would affirm the Court of Appeals decision and

---

[1] MCL 722.713; MSA 25.493 was part of the Paternity Act, MCL 722.711 *et seq.*; MSA 25.491 *et seq.* It was repealed by the Legislature, effective June 1, 1997, after the Court of Appeals declared it unconstitutional in *Dones v Thomas*, 210 Mich App 674; 534 NW2d 221 (1995). See 1996 PA 308.

remand the case for further consideration of the parties' arguments pertaining to retroactivity.[2]

Section 3 of the statute at issue provided:

> a) An agreement or compromise made by the mother or child or by some authorized person on their behalf with the father concerning the support and education of the child shall be binding upon the mother and the child only when the court having jurisdiction to compel support and education of the child shall have determined that adequate provision is reasonably secured by payment or otherwise and has approved the agreement or compromise.
>
> b) The performance of the agreement or compromise, when so approved, *shall bar other remedies of the mother or child for the support and education of the child.* [Emphasis added.]

A

Plaintiff brought an equal protection challenge to § 3. As the majority has indicated, any one of three different standards of review applies to equal protection challenges, depending on the nature of the alleged classification. *Ante*, p 259.

I disagree with the majority's holding that it is equally reasonable to apply the rational basis standard of review to § 3 as to apply an intermediate or heightened scrutiny standard. *Ante*, p 264. Intermediate or heightened scrutiny applies to claims of disparate treatment based on the legitimacy or illegitimacy of a person. *Mills v Habluetzel*, 456 US 91; 102 S Ct

---

[2] I do not treat the arguments concerning retroactivity, because that issue was not considered by the Court of Appeals majority in this case. 232 Mich App 284, 297; 591 NW2d 277 (1998) (FITZGERALD, J., concurring) (*Crego III*).

1549; 71 L Ed 2d 770 (1982); *Pickett v Brown*, 462 US 1; 103 S Ct 2199; 76 L Ed 2d 372 (1983).

The majority states that one could reasonably characterize § 3 as treating children differently on the basis of whether paternity has been established. *Ante*, p 266. That view focuses on the fact that illegitimate children whose paternity has been established are not affected by the statute. Then, it supports a rational basis standard of review, because a classification based on paternity invokes neither intermediate nor strict scrutiny. See *Plyler v Doe*, 457 US 202, 216-217; 102 S Ct 2382; 72 L Ed 2d 786 (1982) (identifying situations in which strict scrutiny applies); *Mills, supra* (identifying situations in which intermediate scrutiny applies).

The majority's view is flawed. It is unreasonable to find that the statute did anything except distinguish the treatment of children on the basis of legitimacy. Although not all illegitimate children received disparate treatment under § 3, the dominant reality is that illegitimate children, and they alone, received disparate treatment. The majority acknowledges that "[t]here is no apparent set of circumstances under which a legitimate child would be the object of an enforceable, nonmodifiable support agreement." *Ante*, p 266.[3]

The United States Supreme Court has held intermediate or heightened scrutiny to apply under similar circumstances. *Clark v Jeter*, 486 US 456; 108 S Ct 1910; 100 L Ed 2d 465 (1988); see also *Williams v*

---

[3] The Paternity Act's description stated that its provisions only apply to illegitimate children: "An act to confer upon circuit courts jurisdiction over proceedings to compel and provide support of *children born out of wedlock* . . . ." 1956 PA 205 preamble.

*Lambert,* 902 F Supp 460 (SD NY, 1995); *Gerhardt v Estate of Moore,* 150 Wis 2d 563; 441 NW2d 734 (1989). In *Clark,* the Court considered a Pennsylvania statute that required illegitimate children to prove paternity before seeking support from their fathers. It required that a suit to establish paternity be brought within six years of the children's birth. *Clark, supra* at 457.

In contrast, legitimate children could seek support from their parents at any time. *Id.* The statute did not affect all illegitimate children by blocking their attempts to obtain support from their fathers. It affected only those illegitimate children who had not established paternity within six years of birth.

Thus, as here, children could have been identified as those whose paternity had been determined and those whose paternity had not. However, the Court was not concerned about that fact, instead it applied intermediate scrutiny to a review of the statute. It stated:

> "First, the period for obtaining support . . . must be sufficiently long in duration to present a reasonable opportunity for those with an interest in such children to assert claims on their behalf. Second, any time limitation placed on that opportunity must be *substantially related to the State's interest in avoiding the litigation of stale or fraudulent claims.*" [*Clark, supra* at 462, quoting *Mills, supra* at 99-100 (emphasis added).]

The Court held that the statute was unconstitutional on the basis that it was not *substantially related* to an important state interest. *Id.* at 464.[4]

___

[4] The majority states that, in *Clark,* the Court never determined whether the challenged statute actually created a classification on the

I reach the same conclusion as did the United States Supreme Court in *Clark*. Even though § 3 did not include every illegitimate child, intermediate scrutiny must apply where the statute affected any child's right to receive parental support on the basis of illegitimacy. Accordingly, intermediate or heightened scrutiny should be the only standard used in considering the constitutionality of § 3. *Clark, supra* at 461.[5]

---

basis of illegitimacy. *Ante*, p 268, n 11. It fails to recognize that there was no other issue in *Clark* that would have compelled the Court to apply the intermediate scrutiny standard of review. Thus, I conclude that the Court did find that the statute created a classification on the basis of illegitimacy.

[5] The majority quotes from *Geduldig v Aiello*, 417 US 484; 94 S Ct 2485; 41 L Ed 2d 256 (1974), to support its position. *Ante*, p 265. However, cases that have followed *Geduldig* indicate that it is not applicable here. See *Eberts v Westinghouse Electric Corp*, 581 F2d 357, 360, n 1 (CA 3, 1978) ("[*Geduldig*] is an insurance case and simply allows the exclusion of pregnancy-related disabilities from an employer's disability benefits plan"). The Sixth Circuit wrote the following regarding the footnote now cited by the majority: "It is apparent from our reading of footnote 20 that the Court's observations are made in the particular and narrow confines of the state's power to draw flexible and pragmatic lines in the social welfare area." *Satty v Nashville Gas Co*, 522 F2d 850, 853 (CA 6, 1975).

The United States Supreme Court, in affirming the Sixth Circuit decision in *Satty*, made the distinction between *Geduldig* and this case even more clear:

Here, by comparison, petitioner has not merely refused to extend to women a benefit that men cannot and do not receive, but has imposed on women a substantial burden that men need not suffer. The distinction between benefits and burdens is more than one of semantics. We held in [*General Electric Co v Gilbert*, 429 US 125; 97 S Ct 401; 50 L Ed 2d 343 (1976) (based on *Geduldig*)], that [the statute] did not require that greater economic benefits be paid to one sex or the other "because of their differing roles in the 'scheme of human existence,'" 429 US 139, n 17. But that holding does not allow us to read [the statute] to permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role. [*Nashville Gas Co v Satty*, 434 US 136, 142; 98 S Ct 347; 54 L Ed 2d 356 (1977).]

Similarly, here, § 3 is not a statute that results in an underinclusive offering of insurance or social program benefits. Rather, § 3 imposes a

B

In order to survive intermediate scrutiny, a statute that results in the treatment complained of must be "substantially related to an important governmental objective." *Clark, supra* at 461. The majority attempts to show that, even when intermediate scrutiny is applied, § 3 passes constitutional muster. *Ante*, p 281. It relates the important government objective of § 3

> to address paternity proof problems in the support context . . . in order to afford the mother of an illegitimate child the opportunity to bind the child's putative father to a support order, without a final determination of paternity, and thereby to afford enhanced opportunities for the support of illegitimate children. [*Ante*, p 278.]

I recognize the importance of the state's interest in enhancing the opportunity for illegitimate children to obtain support from their fathers. However, I disagree with the majority that § 3 is substantially related to that purpose.

While the Supreme Court in *Clark* did not rest its decision on such grounds, it recognized that the need for child support changes over time.

> A mother might realize only belatedly "a loss of income attributable to the need to care for the child," *Pickett, supra* [p 12]. Furthermore, financial difficulties are likely to increase as the child matures and incurs expenses for clothing, school, and medical care. . . . Thus it is questionable whether a State acts reasonably when it requires most paternity and support actions to be brought within six years of an illegitimate child's birth. [*Clark, supra* at 463-464.]

---

burden on illegitimate children and their mothers by foreclosing any opportunity to modify child support agreements. See *Gerhardt, supra* at 572.

How much more unreasonable is it for a state to preclude any modifications to support agreements entered into shortly after a child's birth in light of those same factors? The Wisconsin Supreme Court answered that question when it decided the case of *Gerhardt, supra,* on remand from the United States Supreme Court for reconsideration in light of *Clark.*[6]

In *Gerhardt,* the Wisconsin Supreme Court considered a statutory provision that authorized lump-sum payments to encourage the settlement of paternity cases. The provision forbade the revision or alteration of such settlements, unless the father failed to comply with their terms. *Gerhardt, supra* at 571.[7] The court concluded:

> Because marital children are not precluded from seeking additional child support notwithstanding a prior court order setting the amount of support, we conclude that prohibiting nonmarital children involved in lump-sum settlement agreements from seeking additional support amounts to a denial of equal protection. [*Id.* at 565.]

In *Gerhardt,* the defendant argued, as the majority concludes here, that the statutory provision gives illegitimate children an additional option in the form of a lump-sum settlement provision. *Id.* at 571; *ante,* p 279. The *Gerhardt* court, however, recognized the error in that argument.

---

[6] The remand order appears at: *Gerhardt v Estate of Moore,* 486 US 1050; 108 S Ct 2814; 100 L Ed 2d 915 (1988).

[7] The Court stated the issue as follows: "[W]hether a statutory provision denying nonmarital children involved in lump sum child support settlements the ability to seek additional support from the father, a right not denied marital children, amounts to a denial of the equal protection of the law." *Id.* at 735.

[I]t is an option that has in reality worked to the detriment of many nonmarital children. It is, at best, an illusory benefit amounting to no benefit at all. It is, in reality, an additional burden. Similar to the procedural bars invalidated in the *Clark* line of cases, the lump-sum settlement provision deprives certain nonmarital children the opportunity to obtain adequate support. Although *Clark* and the cases cited therein deal with statutory limitation bars to the filing of actions, the bar to seeking additional child support that results from a lump-sum agreement works in precisely the same manner. Regardless of the label attached to the statutory bar, the result is the same. The nonmarital child, unlike the marital child, is barred from seeking additional support, regardless of need. *That is hardly fair to the nonmarital child, much less constitutional. That is what the United States Supreme Court recognized in remanding this action, and that is what we recognize today.* [*Id.* at 571-572 (emphasis added).][8]

---

[8] The Wisconsin Supreme Court is not alone in its conclusion. A New York federal district court believed that a New York appellate court would strike down a substantially similar New York statute on the basis of *Clark* or construe the statute so that it would permit an illegitimate child to seek modification of a support agreement. *Williams, supra* at 463, n 5.

The Illinois Supreme Court, on the basis of *Clark* and *Gerhardt*, took the second approach. In *Dep't of Public Aid ex rel Cox v Miller*, 146 Ill 2d 399, 408-410; 586 NE2d 1251 (1992), that court considered "whether a settlement order and dismissal entered in a paternity action bar a subsequent action brought by or on behalf of the illegitimate minor for support." *Id.* at 403. The court identified that previous appellate court decisions held that the Illinois Paternity Act did not " 'permit the mother, alleged father, or a public agency which has supported the child to bring an action after a court-approved settlement has been reached.' " *Id.* at 402 (citation omitted). The court agreed with the analysis of *Gerhardt.* It held that equal protection of the law would be violated if illegitimate children were unable to seek modification of child support agreements when legitimate children had that opportunity. *Id.* at 411. To salvage the statutory scheme, the court read the act to allow illegitimate children to bring an action to modify child support agreements. Contrary to the majority's assertion, the "plain language of the statutory scheme" allowed a child to bring an action at any time only to ascertain paternity. *Id.* It said nothing of a child's right to modify otherwise nonmodifiable support agreements. *Id.*

The majority attempts to discredit my citation to *Cox* by identifying it as dicta and trying to distinguish the instant case from it. See *ante,*

I agree with the Wisconsin Supreme Court that stat-
utes such as § 3 violate an illegitimate child's right to
equal protection of the law. Similar to the Wisconsin
statute, § 3 actually limited the opportunities for ille-
gitimate children to receive support from their puta-
tive fathers. It did so by foreclosing any opportunity
for support orders to be modified beyond what was
agreed to under conditions very likely unfavorable to
both mother and child.[9] It is unreasonable to believe
that an agreement entered into at the onset of a
child's life can accurately anticipate and provide for
all the contingencies that child will face until reach-
ing adulthood. Thus, I conclude that § 3 worked
against and failed to be substantially related to the

---

pp 276-277, n 15. In *Cox*, the statute did not allow modification of child
support agreements until the court interpreted it to do so. That was in the
face of a constitutional challenge on the basis of *Clark* and *Gerhardt*.
Thus, the case is similar to the instant case, and its discussion of *Clark*
and *Gerhardt* were essential to its resolution.

[9] The United States Supreme Court identified the difficult situation that
a mother faces when deciding whether to file a paternity suit.

"It requires little experience to appreciate the obstacles to such
suits that confront unwed mothers during the child's first year.
Financial difficulties caused by child-birth expenses or a birth-
related loss of income, continuing affection for the child's father, a
desire to avoid disapproval of family and community, or the emo-
tional strain and confusion that often attend the birth of an illegiti-
mate child all encumber a mother's filing of a paternity suit . . . ."
[*Mills, supra* at 103.]

Those factors are present when an unwed mother must decide, shortly
after her child's birth, whether to accept a settlement from the putative
father. How could she be certain of the support needs of her and her child
for the next eighteen years? See *Cox*, n 8 *supra* at 407. It is readily appar-
ent that, under such circumstances, a mother and child may not receive
the "enhanced opportunities" that the majority asserts § 3 provides to
them. See *ante*, p 278.

state's interest in procuring adequate child support for illegitimate children.[10]

In a somewhat analogous situation, our Court of Appeals declared that a noncustodial father could *not* avoid his obligation to support his child by voluntarily terminating his parental rights. *Evink v Evink*, 214 Mich App 172; 542 NW2d 328 (1995). It recognized that "[a] child has an inherent right to parental support" and "parents may not bargain away a child's right to receive adequate support." *Id.* at 175-176 (citations omitted):

---

[10] The majority fails to give appropriate weight to the fact that settlement agreements result in a burden on the mother and the child when they provide inadequate child support. See *ante*, p 275.

In addition, the majority attempts to draw a distinction between this case and *Gerhardt* because the statute in *Gerhardt* allowed nonmodifiable child support agreements in all paternity actions. Also, in *Gerhardt*, there was an admission of paternity. *Id.* Each is a distinction without a difference. The fact that the statute in *Gerhardt* applied to all paternity actions does not diminish the fact that both it and § 3 had disparate effects on illegitimate children. There is, as the majority asserts, a clear relationship in Michigan between our statute and paternity proof problems. However, it is also true that § 3 discriminates against illegitimate children in the same manner as the statute at issue in *Gerhardt*.

Neither is it of any significance that there was an admission of paternity in *Gerhardt*. That fact was irrelevant to the court's determination that the statute was not substantially related to an important government objective. *Gerhardt, supra* at 574; see also *Cox, supra* at 408. One would expect that, had paternity not been admitted or established in *Gerhardt*, as it has not been here, the *Gerhardt* court would have reached the same conclusion.

In an effort to justify the statute, the majority reaches to find a *benefit* in the fact that "putative fathers who agreed to nonmodifiable support are precluded from taking advantage of advances in technology to disprove paternity, just as the mothers are to prove paternity." *Ante*, p 280. I fail to see how that is a benefit, because one of our major goals is to ascertain the truth. The state clearly does not have a substantial state interest in furthering falsehood and avoiding the truth. Although the majority names additional benefits that the statute provides, none of them outweigh the substantial interest our state has in ensuring that our youngsters receive adequate support throughout childhood.

To accept defendant's position would be to allow a parent
to voluntarily release parental rights in order to escape the
child support obligation where the child remains in the cus-
tody of the other biological parent. Such a result is not sup-
ported by statute, case law, or sound public policy. [*Id.* at
176.]

### CONCLUSION

In this case, § 3 of the Paternity Act presented a
father with the same opportunity, that of evading his
child support obligation, as was rejected by the Court
of Appeals in *Evink*. The act allowed a father to vol-
untarily enter into a child support agreement that the
mother could not modify, even if the child's needs
increased. The act allowed a father to escape his
responsibility to provide for his child, and the child
was deprived of that to which it was entitled.[11] No
similar "loophole" exists in the law for the benefit of
fathers of legitimate children.

Accordingly, I conclude that § 3 violated the right
of illegitimate children to equal protection under the
law. In so doing, I align myself with the position of
three different panels of the Court of Appeals,[12] the

---

[11] Contrary to the assertion by the majority, *Evink* illustrates precisely
why we should not allow illegitimate children to be burdened by
nonmodifiable child support agreements. See *ante*, p 274, n 13. The major-
ity fails to acknowledge that a putative father may very well know that he
is the father of a child. However, he may be able to profit from the diffi-
cult situation the mother faces to procure a settlement he finds favorable.
The majority identifies the statute as providing an illegitimate child with
an opportunity to obtain child support from someone who might not oth-
erwise provide it. However, it also allows someone who might otherwise
have been responsible for adequate child support to avoid that obligation.

[12] See *Dones*, n 1 *supra; Crego v Coleman*, 226 Mich App 815 (1997)
(*Crego II*); *Crego v Coleman*, n 2 *supra* (*Crego III*).

Illinois Supreme Court,[13] and the Wisconsin Supreme
Court.[14] The majority decides to proceed down a dif-
ferent path. I would affirm the judgment of the Court
of Appeals and remand for further consideration of
the parties' arguments concerning retroactivity. I can-
not follow the majority down a path that leads to a
position contrary to the constitution.

CAVANAGH, J., concurred with KELLY, J.

WEAVER, C.J. I respectfully dissent from the major-
ity's conclusion that MCL 722.713; MSA 25.493 did not
violate equal protection. I believe that the statute cre-
ates a classification based on illegitimacy and that the
statute cannot withstand the heightened scrutiny
applied to such a classification. Therefore, I would
affirm the Court of Appeals.

Because there are situations in which illegitimate
children receive a right to modifiable support, the
majority opines that this statute does not create a
classification based on illegitimacy, but one based on
whether "paternity ha[s] been legally determined."
*Ante* at 264. I disagree.

Children have a right to support from their biologi-
cal parents. See *Evink v Evink*, 214 Mich App 172,
175-176; 542 NW2d 328 (1995). As the majority
acknowledges, MCL 722.713; MSA 25.493 affects *only*
the right of illegitimate children, precluding them
from obtaining additional support to meet changing
needs where the parties have reached a settlement
agreement pursuant to the statute. By contrast, there
are no circumstances under which a legitimate child

---

[13] *Cox*, n 8 *supra.*
[14] See *Gerhardt, supra.*

would be foreclosed from petitioning for future modification of child support. Pursuant to MCL 552.17(1); MSA 25.97(1), children of divorced couples may petition the court to modify a support award upon demonstrating changed circumstances, and the parents cannot bargain away the right to seek modification of support. See *Calley v Calley*, 197 Mich App 380, 382, n 1; 496 NW2d 305 (1992); *Johns v Johns*, 178 Mich App 101, 106; 443 NW2d 446 (1989). Therefore, I would conclude that the statute classifies children on the basis of illegitimacy and not on the basis of whether paternity has been legally determined.

Classifications based on illegitimacy are subject to heightened scrutiny. *Clark v Jeter*, 486 US 456, 461; 108 S Ct 1910; 100 L Ed 2d 465 (1988); *Spada v Pauley*, 149 Mich App 196, 203; 385 NW2d 746 (1986). To withstand heightened scrutiny, the statutory classification must be substantially related to an important governmental objective. *Clark, supra* at 461. This level of scrutiny "is not a toothless one." *Pickett v Brown*, 462 US 1, 8; 103 S Ct 2199; 76 L Ed 2d 372 (1983), quoting *Mathews v Lucas*, 427 US 495, 510; 96 S Ct 2755; 49 L Ed 2d 651 (1976). MCL 722.713; MSA 25.493 fails to satisfy this standard.

In upholding the statute, the majority concludes that the statute is substantially related to the "permissible, important, and even compelling governmental interest" of providing financial support for children. *Ante* at 273. The majority reasons that the statute affords illegitimate children an "additional optional mechanism for obtaining support" by allowing the parties to circumvent the proof problems that may arise in paternity cases. *Ante* at 279. I disagree.

I recognize that the problems in proving paternity distinguish legitimate children from illegitimate children in their claims for child support. However, this justification is neither "sufficiently weighty nor substantially related to the limitation" to uphold MCL 722.713; MSA 25.493 under equal protection. *Mills v Habluetzel*, 456 US 91, 102; 102 S Ct 1549; 71 L Ed 2d 770 (1982) (O'Connor, J., concurring).[1] Nor are the state's interests in settlement and finality sufficient to justify a classification based on illegitimacy.

As noted earlier, children have a right to support. *Evink, supra* at 175-176. However, rather than operate as an additional mechanism for support, the statute, in reality, imposes a burden on illegitimate children by restricting their ability to obtain adequate support. The Wisconsin Supreme Court made a similar conclusion when striking down a statutory scheme that precluded illegitimate children involved in lump-sum settlement agreements from seeking additional support, stating,

> [I]t is an option that has in reality worked to the detriment of many nonmarital children. It is, at best, an illusory benefit amounting to no benefit at all. It is, in reality, an additional burden. [*Gerhardt v Estate of Moore*, 150 Wis 2d 563, 571; 441 NW2d 734 (1989).]

The possibility that children may encounter circumstances that alter their need for support does not vary between illegitimate and legitimate children. Both may encounter circumstances that give rise to a need for increased support. Yet, in the case of illegitimate children, they may be deprived of the opportunity to

---

[1] A total of five justices joined this section of Justice O'Connor's concurring opinion. *Mills, supra* at 102.

seek increased support on the basis of changed circumstances because their parents entered an agreement, pursuant to the statute, that precludes modification. Thus, the statute actually operates to their detriment.

In my opinion, neither proof problems nor the interests of settlement and finality outweigh the irrevocable and potentially damaging effect that a nonmodifiable settlement may have on the changing financial needs of illegitimate children. Consequently, the statute is not substantially related to the supposed interest it seeks to serve—namely, providing an additional mechanism for obtaining support for illegitimate children—and it should be determined to be violative of equal protection.